530 A.2d 430

**In re A.M. and P.M. Minors.**

**Appeal of DOROTHY M. and James M.**

Superior Court of Pennsylvania.

Argued June 23, 1987.

Filed Aug. 20, 1987.

Anne Vaughan, Media, for appellants.

Joyce A. Monaco, Media, for appellees.

Before MCEWEN, TAMILIA and HOFFMAN, JJ.

TAMILIA, Judge:

Appellants appeal from an Order entered by the court below on December 11, 1986, which approved and adopted a master's determination that appellants' two children, A.M. and P.M., were dependent and which placed legal and physical custody of the children with Children and Youth Services of Delaware County (CYS) retroactive to August 14, 1986. Appellants filed an appeal with this Court on December 26, 1986, but also filed exceptions with the court below. At a hearing on the exceptions on January 28, 1987, Judge Robert A. Wright advised appellants' counsel that she could not have her exceptions heard while her appeal was pending. Counsel chose to withdraw her exceptions and await the outcome from this Court. We affirm the lower court's Order.

■ In his Opinion, the trial judge takes the position that there should be no appeal unless the party who is dissatisfied with the decision of a master has requested a rehearing (Slip Op., Wright, R., 2/4/87, pp. 2, 4, 5). This is not contemplated by the statutory scheme. The Juvenile Act, 42 Pa.C.S.A. § 6301 *et seq.*, provides for a hearing to be held before a master, instead of a judge, if there is no objection made by any party (42 Pa.C.S.A. 6305(b)). "A rehearing before the judge may be ordered by the judge at any time upon cause shown. Unless a rehearing is ordered, the findings and recommendations become the findings and order of the court when confirmed in writing by the judge." (42 Pa.C.S.A. § 6305(d).) The section clearly does not require that exceptions be filed (as in the divorce and support rules) nor that a rehearing must be requested before an appeal can be taken from a court-approved master's determination.

The use of masters in family related cases has become quite extensive—in divorce proceedings, Pa.R.C.P. 1920.51, Hearing by the Court. Appointment of Master. Notice of Hearing and Pa.R.C.P. 1920.53, Hearing by Master. Report, and in support proceedings, Pa.R.C.P. 1910.10, Alternative Hearing Procedures, Pa.R.C.P. 1910.11, Office Con-

ference. Subsequent Proceedings. Order and Pa.R.C.P. 1910.12, Office Conference. Hearing. Record. Exceptions. Order. In each of the above, there is a provision for written exceptions to be filed within a ten-day period which, for support cases, will result in either a hearing de novo by the court, Pa.R.C.P. 1910.11 (f), (g) and (i), or arguments on the exceptions, Pa.R.C.P. 1910.12(e) and (g), followed by a final appealable Order. In divorce cases, it is provided by Pa.R.C.P. 1920.55, Master's Report. Notice. Exceptions. Final Decree, that (a) exceptions must be filed within ten days of notice of filing of the master's report, (b) if no exceptions are filed, the court shall review the report and if approved, shall enter a final decree and (c) if exceptions are filed, the court shall hear argument and enter an appropriate final decree. In each of the procedures, it is clear there is no alternative to proceeding except as detailed by the rules; failure to do so results in a waiver of any alleged error for appeal purposes. No similar provisions are contained in the Juvenile Act, § 6305(b). The failure of the act to specifically require exceptions or to mandate a review by the court, instead leaving this within the trial court's discretion, would appear to obviate review as a mandatory part of the post-adjudication procedure, such as required in support and divorce actions. We also point out that the rules explicitly exempt custody and paternity proceedings from hearings by masters. Pennsylvania Rules of Civil Procedure 1920.51(a)(2)(iii) states: "No master may be appointed in a claim for custody or paternity."

It has been the time-honored and universal rule that where custody of children is in issue, the decision may only be made by a judge. (*See* 48 P.S. § 92 Judges to decide disputes as to children's custody.) The departure in juvenile cases appears to be in response to the heavily burdened juvenile courts of the state and the provision for rehearing on cause shown is to permit the ultimate determination on the facts to be made by a judge. However, since he must exercise discretion as to whether or not such rehearing must be granted, it cannot be maintained that a respondent has a right to review. Obviously, the legislature intended

to grant the juvenile judge authority to rehear a case heard by a master if he deemed it necessary. We can only take this to mean that a final Order by a trial judge, whether or not petition for rehearing was filed, is appealable and there is no requirement to file exceptions to the master's report to preserve issues on appeal. We would be loathe to find otherwise, absent explicitly clear legislative intent, as no cause presented to the court carries greater implications for society than the intrusion of the state into the relationship between a child and his parent. We could not conceive of a more deleterious provision in the law than to foreclose a parent from appealing the decision of a master or court for failure to file exceptions when no requirement to do so is evident, no time for doing so is set and no notice provision is established. We can only perceive that 42 Pa.C.S.A. 6305(b) was not meant as a post-trial review process but rather was meant to provide an additional safeguard to the use of masters, when such a proceeding is not used in ascertaining custody elsewhere in the law.

The Juvenile Act, at 42 Pa.C.S.A. § 6341, sets forth a two-step process to be applied in child dependency cases. That section provides in pertinent part:

§ 6341. Adjudication

(a) General Rule.—After hearing the evidence on the petition the court shall make and file its findings as to whether the child is a dependent child ...

. . . .

(c) Finding of dependency.—If the court finds from clear and convincing evidence that the child is dependent, the court shall proceed immediately or at a postponed hearing, which shall occur not later than 20 days after adjudication if the child has been removed from his home, to make a proper disposition of the case.

In *In the Interest of C.A.M.*, 264 Pa.Super. 300, 399 A.2d 786 (1979), we held that an appeal cannot be taken from the determination of dependency, as that is interlocutory in nature, but appeal will lie after final disposition has been

made. "After a final disposition has been made, the entire proceedings will be subject to review, including the sufficiency of the evidence to support the court's finding of dependency." *Id.*, 264 Pa.Superior Ct. at 302, 399 A.2d at 787. *See In re Sharpe*, 248 Pa.Super. 74, 374 A.2d 1323 (1977); *In the Interest of LaRue*, 244 Pa.Super. 218, 366 A.2d 1271 (1976); *In the Matter of DeSavage*, 241 Pa.Super. 174, 360 A.2d 237 (1976).

As both of the steps had been taken in the instant case, appellants properly brought their timely appeal before this Court. Thus we may proceed to examine the merits of their claims.

■ Appellants' first issue on appeal is whether the court's adjudication of dependency and disposition was supported by clear and convincing competent evidence. We find there is ample evidence on the record to support the court's finding of dependency.

A.M. is eight; P.M. is eleven (H.T. 8/26/86, p. 3). A CYS worker began an investigation on July 31, 1986, into allegations of abuse of the children (H.T. 8/26/87, pp. 15–16). Appellee/CYS's basis for action was a referral from Connecticut.

The Connecticut CYS informed the Delaware County CYS that the family had been brought to its attention on March 26, 1986, when an emergency shelter staff there reported that both children were subject to a serious lack of proper parental care and control (Request for Protective Custody Order, 8/13/86, p. 1). The Request for Protective Custody Order stated that the Connecticut referral said:

Both children displayed frightened withdrawn behavior, alternating at times with overly aggressive behavior toward peers. [A.M.] made statements to a counselor that her father hits her 'all the time' and that she was afraid someone would tell her father she told. On two occasions, [A.M.] was observed to have evidence of injury, one a 'large injury on the right side of her cheek' and the other 'a large red mark with scratches on the inside of the arm.' It was reported that '[A.M.] is often tearful

and distressed, unable to participate in the program's activities.'

[P.M.] was described as having (prepsychotic) behavior, e.g. 'stalking in the halls animal-like, making grunting sounds.' On a day when [P.M.] and [A.M.] were left unsupervised overnight at the shelter and missed their school bus, [P.M.] would not speak and 'tried to crawl in a narrow spot between a bookcase and the wall, attempting to curl up in a ball.' Another child in the shelter program reported to a counselor that [P.M.] had told her that his father punished him for his encopresis (i.e. inability to control his bowel functions) by making him eat his feces. Mr. [M.] was reported to engage in a regular pattern of belittling both children verbally (e.g. calling them 'dumb', 'stupid' and 'useless') and in physical intimidation under the guise of 'playfullness' (e.g. punching at [P.M.] with his knuckles and then laughing and acting like they were sparring together).

.     .     .     .     .

Subsequent to the acceptance of this case in Connecticut as an 'at risk' situation, the family moved to another community in that state and then left that locale with status of whereabouts unknown....

Request for Protective Custody Order, pp. 1–2.

The Request Order also said:

On August 7, 1986, an Intake Worker at the Department of Public Assistance reported that while in that office, [A.M.] and [P.M.] were observed to be 'dirty and out of control' and that the parents 'hit them' and exercised other inappropriate means of control.

On August 8, 1986, the staff person at the Emergency Shelter reported that she recalled, also, observing 'red marks' on [A.M.'s] neck while the family was at the shelter. She reported that she had information that the family planned to move to New Jersey.

Request for Protective Custody Order, p. 2.

The New Jersey state agency was involved with the family from 1982 to 1985 (H.T. 8/26/86, pp. 19–20). Investi-

gation into records of New Jersey state showed that A.M. and P.M. were picked up by police at a casino there; P.M. had been hit by a car and A.M. was found to have head lice (H.T. 8/26/86, p. 54). On the basis of the serious allegations of the Department of CYS in Connecticut, the pattern of behavior reported from local sources and the fact that there was an established pattern of flight, together, with a tip that the family planned another move, CYS requested that protective custody of P.M. and A.M. be taken and that they be placed in a CYS foster home until a right to detain hearing could be held.

An Order was entered on August 14, 1986, granting CYS protective custody of the children, effective August 13, 1986, with placement in an agency-approved foster home until the right to detain hearing; the hearing was held on August 15, 1986, at which time appellants stipulated to detention of their children pending adjudication. Hearings were held before a master on August 26, 1986, September 11, 1986, and December 5, 1986. As a result of these hearings, the master adopted the recommendation of CYS that the children be placed in its care. The master's findings were adopted by the court on December 11, 1985.

At the August 26 hearing, Jan Lizotte, the coordinator of Concern, Inc. (Concern), a foster care agency, testified, over objection, the foster mother had made to him certain statements which she said the children had made to her. He said the foster mother had reported that P.M. seemed quite obsessed with sexual material, he talked quite frequently about having had sex and he was preoccupied with discussions about sex (H.T. 8/26/86, p. 121).

He further testified the foster mother had reported that A.M. also talked quite a bit about sexual issues (H.T. 8/26/86, p. 122). A.M. discussed being made by her mother to watch pornographic movies (H.T. 8/26/86, p. 12). She also discussed with the foster mother having watched her parents have intercourse (H.T. 8/26/86, p. 123).

Psychologist Donald Pixler evaluated both children. He testified A.M. was preoccupied with sexualized themes and

images (H.T. 8/26/86, p. 150). She exhibited defensiveness around males and was most receptive to female figures. Pixler testified P.M. had seen a form on Pixler's desk which asked for name, age and sex. He described the boy's reaction to that form as follows:

As he read those, when he got to the word sex, he immediately went off on a monologue about graphic sexual experiences that he had allegedly performed, engaged in, witnessed.... The acts included oral sex, genital sex, collusion with another individual, identified as an adult male to rape another individual.... They were very explicit, far beyond what you would call developmentally familiar or appropriate renditions of such experiences.

(H.T. 8/26/86, pp. 153–55.)

At a hearing held on September 11, 1986, the foster mother testified, over objections, as to statements the children had made to her. She testified:

And [P.M.] had said he had watched porno films, and [A.M.] had said that night, 'Did I tell you that I also watched them?' And I said, 'No, you didn't.' And she said, 'Well, yeah, I did.'

And she [sic] [foster mother] said, 'Well, what did you think of it?' And she said, 'I didn't like it very much.' And I said, ''Why did you watch it?' And she says, 'Because Mommy says that I will have to do these things someday.' And I said, 'And what else made you nervous about watching the films?' She said, 'Well, I have to pull my pants down sometimes after.' And I said, 'Well, is there anything else?' And she said, 'Mommy and Daddy would have sex sometimes after the films in front of me.' And I said, 'Well, did they say anything to you?' And she said, 'Yes.' She said that, 'Mommy said that someday I will want to do these things.'

(H.T. 9/11/86, pp. 9–10.)

The foster mother also testified:

She has said that, 'Daddy uses Vaseline, and Mommy doesn't.' Since she was 4 years old, she said that Daddy

has touched her down below, and that Mommy also touched her, but didn't use Vaseline.... She said that she doesn't mind too much, because it doesn't hurt very much and that they are her parents, so that makes it okay, doesn't it, and that is what she has said to me. (H.T. 9/11/86, pp. 10–11.)

The foster mother further said the children were infested with head lice, and she had just about cleared the problem up, when the children returned from a visit with the parents and had more mature head lice (H.T. 9/11/86, p. 11).

She testified that P.M. asked her husband, in her presence, about porno films for their video cassette recorder. She said the conversation went as follows:

'Do you have any of the movies where the people are having sex?' And my husband said, 'No, we don't have those kind of movies.' And he said, 'Well, how about the magazines where the people are, you know, doing things?' He said, 'Do you have any of them?' And he said, 'No.' He asked us if we smoke pot.

.    .    .    .    .

Whenever someone on the TV comes on the TV [sic] and the boy sees a woman with legs, he gets all excited, and he starts, you know, with, 'Well, you know what is above their legs.'

(H.T. 9/11/86, p. 12.)

The foster mother also testified as to the childrens' hygiene. She said that P.M. had gnats and wet and messed his pants. When both children would eat at the dinner table, they would use their hands to eat mashed potatoes, vegetables or anything else (H.T. 9/11/86, p. 14).

The Pennsylvania Child Protective Services Law, 11 P.S. § 2208(a)(1), says a child may be taken into custody as provided by the Juvenile Act, 42 Pa.C.S. § 6324. That section, in turn, authorizes a law enforcement officer or duly authorized officer of the court to take a child into custody "if there are reasonable grounds to believe that the child is suffering from illness or injury or is in imminent

danger from his surroundings, and that his removal is necessary." (42 Pa.C.S.A. § 6324.) The child protection agency's own investigation, along with the out-of-state reports, provided a more than sufficient basis for appellees to believe A.M. and P.M. were in need of protection and to indicate the need for their removal. This is especially true in light of the family's pattern of flight and the indication that the family planned another move out of the area.

Likewise, evidence contained in the record is sufficient to support the lower court's adjudication of dependency and subsequent disposition of the children. "A court may find a child dependent only on proof by clear and convincing evidence." *In Interest of Leslie H.*, 329 Pa.Super 453, 456, 478 A.2d 876, 878 (1984) (citing *In re Frank W.D.*, 315 Pa.Super. 510, 462 A.2d 708 (1983)). In *Leslie H.*, we vacated a court Order which had adjudicated the minor involved to be dependent. The only testimony offered by the Commonwealth at the hearing had been hearsay statements made by the minor's best friend and an agency investigator. We said that with the hearsay discounted, little remained on record to support the lower court's finding. In the instant appeal, appellants allege the only evidence of any sexual abuse of the children is hearsay testimony of the foster mother, the psychologist who examinied the children and the caseworkers involved in the matter and, therefore, *Leslie H., supra,* should control.

■ Our legislature has spoken on this issue, however, since the time of the *Leslie H.* decision. Effective April, 1986, hearsay statements are admissible in evidence in dependency proceedings under certain circumstances. Under 42 Pa.C.S.A. § 5986, it is provided:

### § 5986.  Hearsay

A statement made by a child describing acts and attempted acts of indecent contact, sexual intercourse or deviate sexual intercourse performed with or on the child by another, not otherwise admissible by statute or court ruling, is admissible in evidence in a dependency proceeding initiated under Chapter 63 (relating to juvenile mat-

ters), involving the child or other members of that child's family, if a court finds that the time, content and circumstances of this statement provide sufficient indicia of reliability.

The statements in question were, therefore, properly admitted.

In *Frank W.D., supra,* we set out the standard of review which we are to use in cases such as the one before us. We said:

> The standard of review which this Court employs in cases of dependency is broad. *In Re Custody of Neal,* 260 Pa.Super. 151, 393 A.2d 1057 (1978). However, the scope of our review is limited in a fundamental manner by our inability to nullify the fact-finding of the lower court. *Commonwealth ex rel. Spriggs v. Carson,* 470 Pa. 209, 368 A.2d 635 (1977). We accord great weight to this function of the hearing judge because he is in the position to observe and rule upon the credibility of the witnesses and the parties who appear before him. *In Re Interest of Black,* 273 Pa.Super. 536, 417 A.2d 1178 (1980); *In Re Kunkle,* 265 Pa.Super. 605, 402 A.2d 1037 (1979). Relying upon his unique posture, we will not overrule his findings if they are supported by competent evidence. *Commonwealth ex rel. Morales v. Morales,* 222 Pa. Super. 373, 294 A.2d 782 (1972).

*Id.,* 315 Pa.Superior Ct. at 517, 462 A.2d at 711.

We find here that the master had competent evidence to support his findings and, therefore, the lower court's adjudication of dependency was proper. In *In Interest of Y.P.,* 353 Pa.Super. 185, 509 A.2d 397 (1986), we said, "A child who has been adjudged dependent may not be removed from parental custody unless such separation is clearly necessary. Clear necessity is established when the court determines that alternatives to separation are unfeasible." *Id.,* 353 Pa.Superior Ct. at 189, 509 A.2d at 399. In that case, as here, sexual abuse of two children was the reason for the dependency finding. We determined that since

sexual abuse was found, removal was necessary to protect the children from any repetition of the acts.

█ In the instant appeal, we conclude removal was necessary to prevent continuing opportunity for the parents to commit acts of abuse on A.M. and P.M. While a primary purpose of the Juvenile Act is to preserve the unity of the family whenever possible (42 Pa.C.S.A. § 6301(b)(1)), in view of the history of the parents avoiding supervision and/or rehabilitation by moving from one jurisdiction to another, resulting in failure to rectify serious parenting deficiencies and continuation of physical and moral debasement of the children, all of which has continued unabated since 1982, no other alternative than placement outside the home is available. This is one of the numerous cases which cries out for intensive effort to gain the parents' attention and cooperation in altering their lifestyle and parenting techniques. This the trial judge has done in his carefully drafted and well considered Order. Failing this in a reasonable time, serious consideration should be given to termination of parental rights under the prevailing doctrine of Permanency Planning for children in foster care.

Order affirmed.