414 Pa. Superior Ct. 372 (1992)
607 A.2d 271
In re M.T., R.T. & H.T.
Appeal of L.T.
Superior Court of Pennsylvania.
Submitted December 12, 1991.
Filed April 20, 1992.
*375 Jay Stillman, Asst. Public Defender, Williamsport, for appellant.
Ralph W. Thorne, Williamsport, for appellees.
Charles F. Greevy, III, Williamsport, for participating party.
Before OLSZEWSKI, HUDOCK and BROSKY, JJ.

OPINION
PER CURIAM:
This is an appeal from the decree entered by the trial court which terminated appellant's parental rights in her children, M.T., R.T. and H.T. The following issues are presented for our review: (1) whether there was sufficient evidence to establish that the conditions which led to the placement of the children with the Lycoming County Children & Youth Services would not or could not be remedied within a reasonable period of time with the provision of reasonably available services; and (2) whether the trial court erred in admitting the following into evidence: (a) various out-of-court statements by the children; (b) a psychological evaluation prepared by Robert Meacham; (c) testimony of Cheryl Nierle; and (d) a court order dated *376 October 4, 1989. For the reasons set forth below, we affirm the decree terminating appellant's parental rights.
Before addressing the issues raised by appellant, it is necessary to discuss the lengthy history of this case. M.T., Sr. and appellant, L.T., are the natural parents[1] of M.T., Jr.,[2] R.T.[3] and H.T.[4] M.T., Sr. and appellant were married when the children were born, but were separated and contemplating divorce at the time of the termination hearings.
Appellee, Children & Youth Services (CYS) of Lycoming County, has a long history of involvement with appellant and her children. In May 1986, CYS first received a referral regarding R.T., who was found to have spinal meningitis, developmental delays, and who was not gaining weight appropriately. The conditions in appellant's home were described as "deplorable," although the family later cleaned their home in response to agency intervention. Further services were thereafter refused by the family and the case was closed.
The next contact arose six months later when M.T. was treated for an eye injury. Both M.T. and R.T. were found to be dirty and physically neglected. The living conditions *377 in appellant's home were described as unclean, cluttered and lacking in running water and proper wiring. H.T. was born at this time and "parent partners" assisted appellant in ridding the home of a lice infestation and an accumulation of trash and debris which had been strewn therein. Although minimal improvements were made, CYS closed the case because of the family's resistance.
CYS had no further contact with the family until October 1988, at which time it received a referral regarding the children's poor hygiene, developmental delays, unsanitary living conditions, lice infestation, and poor housekeeping conditions which included broken windows in the home. The case was closed shortly thereafter because of the family's resistance to intervention.
Approximately six months later, CYS again received a referral regarding the filthiness of the children and poor living/household conditions.[5] Once more, the case was closed because of minimal improvements by the family and continued resistance to further agency assistance. CYS received another referral the following month in which it was discovered that H.T. had been continuously sent to school with extremely dirty hands, feet and face, and had urine and feces-soaked/caked diapers. Poor living conditions and hygiene of the other children were also noted. Following intervention by the agency, M.T., R.T. and H.T. were then adjudicated dependent. However, the children were permitted to remain in the custody of their parents with CYS providing supervision. Despite CYS' involvement, living conditions in the home remained grossly inadequate as the dwelling had broken windows, a broken front door, an oven with the glass broken out and lacked an appropriate source of heat.
During the next several months, CYS had frequent contacts with the family. CYS was advised in August, 1989 *378 that the children had been left alone while appellant was out socializing the entire night with men other than her husband. In September 1989, M.T., Sr. was committed to Divine Providence Hospital because of a suicide attempt. M.T. imitated his father's behavior, thus necessitating the removal of sharp objects from within his reach. A few days later, the family was found to be harboring a juvenile runaway, who was observed engaging in amorous pursuits with a boyfriend while in the presence of two of the children. Two weeks later, the agency was contacted by appellant to remove other juveniles from her home.[6] Throughout this time period, appellant and her husband were ordered to attend parenting classes and appointments with parent partners. The parents' attendance was poor as they missed numerous appointments and classes. Despite intervention and assistance by CYS, the children continued to exhibit extremely poor hygiene in that their clothes were often dirty and they had an odor. H.T. was in such poor condition that on numerous occasions workers from Hope Enterprises, a special program attended by H.T., bathed him and changed his diapers.
On September 25, 1989 R.T. was found to have a black eye which she indicated was caused by her father. When questioned about the incident, appellant gave various versions as to the cause of the injury. Appellant initially claimed that another child at R.T.'s school had caused the injury, but later indicated that an older adult male, who lived near appellant's sister, had inflicted the injury. Approximately one week later, H.T. was also found to have a blackened eye which he claimed was caused by appellant. Appellant denied causing the injury and explained that M.T. had hit H.T. with a toy truck. It was later discovered that M.T., Sr. had allegedly sexually abused R.T. during this same time period. At this point, the children were taken *379 into protective custody by CYS and placed in foster care.[7] CYS thereafter instituted the termination proceedings which form the basis of this appeal.
Several hearings were thereafter conducted. After the conclusion of these hearings, the trial court entered its decree nisi and order on March 14, 1991, which terminated appellant's and M.T., Sr.'s parental rights in their children. Exceptions to the decree were apparently filed on behalf of appellant and/or her husband.[8] The trial court denied the exceptions on April 2, 1991. On April 22, 1991, appellant filed a notice of appeal from the April 2, 1991 order.[9]
As a preliminary matter, we observe that this appeal presents us with egregious violations of our appellate rules of procedure and other serious defects which compel us to express our disapproval of the manner in which the case has been presented to this court. We first observe that appellant's brief violates Pa.R.A.P., Rule 2111(a)(8) and (b), 42 Pa.C.S.A. by failing to include a copy of the opinion of the lower court. Although copies of the lower court's adjudication and opinion issued pursuant to Pa.R.A.P., Rule 1925(a), 42 Pa.C.S.A. are contained in the certified record and/or have been appended to appellee's brief, it is the appellant's responsibility, not that of the opposing party, to supply this court with the appropriate opinions of the lower court. Appellant's statement of the case also violates Pa. R.A.P., Rules 2117(a) and (c), 42 Pa.C.S.A. in that it does not contain the requisites specified in the rule and merely *380 summarizes the testimony of certain witnesses. In addition, the argument portions of appellant's brief violate Pa.R.A.P., Rules 2119(c) and 2132, 42 Pa.C.S.A. (requiring a citation to the place in the record where the referenced matter appears). Portions of appellant's argument are also flawed in that they consist of nothing more than conclusory assertions that are devoid of legal reasoning and citation to relevant authority.
Appellee's brief is likewise defective in that it contains extraneous documents[10] appended thereto which have not been included as part of the certified record. As reiterated by this court, "paper may not be made part of the record simply by reproducing it." Gemini Equipment Co. v. Pennsy Supply, Inc., 407 Pa.Super. 404, 412 n. 5, 595 A.2d 1211, 1215 n. 5 (1991), citing Dorn v. Stanhope Steel, Inc., 368 Pa.Super. 557, 563 n. 1, 534 A.2d 798, 801 n. 1 (1987), allocatur denied, 518 Pa. 656, 544 A.2d 1342 (1988). Because we may only consider matters which have been duly certified in the record on appeal, we will disregard the materials attached to appellee's brief. Gemini Equipment Co. v. Pennsy Supply, Inc. and Dorn v. Stanhope Steel, Inc., supra. However, we direct appellee's attention to Pa.R.A.P., Rule 1926, 42 Pa.C.S.A. which discusses the appropriate method of amending or supplementing the certified record.
While the above infractions of our appellate rules do not substantially impair our ability to engage in effective and meaningful review of the merits of this appeal, appellant's failure to provide us with a complete record presents a more serious impediment. Specifically, appellant has failed to provide this court with a complete transcript of the termination proceedings as well as copies of the documentary exhibits which were admitted into evidence.[11]See Pa. *381 R.A.P., Rule 1921, 42 Pa.C.S.A. (discussing the composition of the record on appeal which includes, inter alia, the original papers and exhibits filed with the court and the transcript of the proceedings). In fact, we question whether appellant has undertaken the requisite steps to have the hearing testimony transcribed, as we have been unable to locate an order for the transcript in the certified record. See Pa.R.A.P., Rules 1911(a) and (c), 42 Pa.C.S.A. (providing that the appellant shall order any transcripts required and that the order for the transcript should be included in the record). While we recognize that appellant is proceeding in forma pauperis,[12] she has been represented by court-appointed counsel throughout the entire termination proceedings, and despite her indigent status, "it is nonetheless appellant's responsibility to order the transcript required *382 and ascertain its presence in the record prior to certification for appeal." Commonwealth v. Osellanie, 408 Pa.Super. 472, 475, 597 A.2d 130, 131 (1991) (emphasis added), citing Dorn v. Stanhope Steel, supra and Rules of Appellate Procedure 1911, 1921 and 1922.
Although appellant's failure to supply this court with the requisite documents would ordinarily preclude us from reviewing the merits of the appeal, we have undertaken extraordinary efforts to obtain the hearing transcripts and exhibits because of the importance of the issues at stake, as well as for the benefit of the children, who will suffer by further delay in this matter.[13] As our initial efforts to secure certified copies of these items proved to be unavailing, it was unfortunately necessary to enter an order directing the lower court prothonotary to supply us with certified copies of the missing transcripts and exhibits. We note that the lower court has complied with our order and that the record is now sufficiently complete to enable us to review the merits of this appeal.
Although of a different nature than the above defects, it is necessary to further comment upon a final matter which we find most disturbing. Based on our review of the record, it appears that the attorney who was appointed to represent the children has abdicated his legal responsibilities. The Domestic Relations Code, 23 Pa.C.S.A. § 2313(a), mandates that counsel shall be appointed to represent the child or children in an involuntary termination proceeding which is contested by one or both of the parents. "The purpose of the statutory requirement . . . [i]s to guarantee that the needs and welfare of the children would be advanced actively by an advocate whose loyalty was owed exclusively to them." In re: Adoption of N.A.G. and A.B.G., 324 Pa.Super. 345, 351, 471 A.2d 871, 874 (1984). A *383 review of the record demonstrates that the purpose of the statute has not been fulfilled here.
In this case, the children's counsel appeared at the termination hearings and engaged in limited cross-examination of a few of the witnesses. However, he never explained, even briefly, on the record whether the requisites for terminating the parents' rights had or had not been met and whether termination would or would not serve the needs and welfare of the children. Our scrutiny of the certified record supplied to this court similarly reveals that counsel did not file any proposed findings of fact, briefs, memoranda of law or anything else which would elucidate his position on behalf of the children. Further, there was nothing in the certified record which indicated that the children's counsel adopted or joined in either of the parties' proposed findings of fact and memoranda. At the appellate level, we likewise lack the benefit of counsel's advice because he has not filed a brief, has not indicated that he is joining in either of the parties' briefs, nor has he otherwise informed this court of his position.
Having discussed the above deficiencies, we must next address two remaining procedural matters which affect our ability to examine the merits of this appeal. See Drohan v. Sorbus, Inc., 401 Pa.Super. 29, 34, 584 A.2d 964, 966 (1990) (providing that we sua sponte may raise a question of appealability as it is a matter which affects our jurisdiction). Consequently, we must ascertain whether this appeal is properly before the court, and if so, whether appellant has preserved her allegations of error for appellate review.
Appellant asserts in her notice of appeal that she is appealing from the "decree nisi issued April 2, 1991."[14] Notice of Appeal, filed April 17, 1991. Appellant's notice is defective in several respects. First, the trial court's order *384 of April 2, 1991 did not enter a decree nisi nor did it purport to enter the decree nisi as a final decree. Instead, this order merely denied appellant's exceptions to the decree nisi which, as noted above, was previously entered on March 14, 1991. More importantly, appellant cannot appeal from the entry of a decree nisi because it is not a final order; rather, the decree only becomes final after the post-trial motions or exceptions thereto have been denied and the decree has been entered as a final order. In re: J.W., 396 Pa.Super. 379, 385, 578 A.2d 952, 955 (1990); Pa.R.A.P., Note to Rule 301, 42 Pa.C.S.A.; and Pa.R.C.P., Rules 227.1 and 227.4(1)(c), 42 Pa.C.S.A., and Notes and Explanatory Comments thereto.
Appellant was notified by this court that a final decree had not been entered. On October 31, 1991 appellant filed a praecipe to enter the decree nisi as a final decree with the Lycoming County prothonotary. Although a copy of appellant's praecipe was submitted to this court, we have not received an amended docketing statement which reflects the entry of a final decree. However, "in the interests of judicial economy, we shall `regard as done that which ought to have been done.'" McCormick v. Northeastern Bank, 522 Pa. 251, 254 n. 1, 561 A.2d 328, 330 n. 1 (1989). As instructed by our Supreme Court, we will therefore proceed to review the merits of this appeal despite the lack of proof of entry of a final decree.
We also question whether appellant has properly preserved her claims for appellate review. It is generally the rule that issues not raised in the lower court are waived and cannot be raised for the first time on appeal. In re: J.W., 396 Pa.Super. at 386, 578 A.2d at 956. See also Pa.R.A.P., Rule 302(a), 42 Pa.C.S.A. Consequently, the parties are required to first raise their claims in post-trial motions before instituting a direct appeal. In re: J.W., supra, citing Pa.R.C.P., Rule 227.1, 42 Pa.C.S.A. But see Matter of Smith, 393 Pa.Super. 39, 573 A.2d 1077 (1990) (en banc) (dissenting opinions authored and/or joined by Cirillo, P.J., Beck, Rowley, Tamilia and Johnson, JJ., in which a *385 majority of the court rejected the view that post-trial motions need to be filed to preserve issues for review in juvenile delinquency/dependency proceedings; one of the dissenters further suggested that post-trial motions were not essential in termination of parental rights proceedings).
Although there appear to be conflicting views as to whether post-trial motions are required to preserve issues for review in appeals from involuntary termination decrees, we need not resolve this question to reach the merits of this case. If such motions are not required, then appellant's claims are properly before us for review. In the alternative, if such motions are mandated, it appears that exceptions in this case were filed.[15] Moreover, we note that appellant also filed a concise statement of matters complained of on appeal pursuant to Pa.R.A.P., Rule 1925(b), 42 Pa.C.S.A., and the trial court addressed these issues in its subsequent opinion. Trial Court Opinion, filed 5/21/91. Under these circumstances, appellant has sufficiently preserved her claims for appellate review.
In evaluating an order terminating parental rights:
the scope of appellate review is limited to the determination of whether the decree of termination is supported by competent evidence. If the decree is adequately supported by competent evidence, and the chancellor's findings are not predicated upon capricious disbelief of competent and credible evidence, the adjudication of the Orphans' Court terminating parental rights will not be disturbed on appeal. . . . [U]nless the Orphans' Court abused its discretion or committed an error of law, its findings are entitled to the same weight given a jury verdict. The trial court, as trier of fact, is the sole judge of [the] credibility of [the] witnesses. Conflicts in testimony are to be resolved by the trier of fact and we may not disturb a decree of [the] Orphans' Court based upon *386 findings supported by the record unless [the] Orphans' Court applies an incorrect legal standard.
In re: Adoption of B.J.R., 397 Pa.Super. 11, 15, 579 A.2d 906, 908 (1990) (citations omitted). See also In re: Baby Boy H., 401 Pa.Super. 530, 534, 585 A.2d 1054, 1056 (1991) (for similar considerations). Furthermore, "[i]n a proceeding to involuntarily terminate parental rights, the burden of proof is upon the party seeking termination to establish by "clear and convincing evidence" the grounds for doing so." In re: B.J.R., 397 Pa.Super. at 13, 579 A.2d at 907. We will evaluate appellant's arguments and the chancellor's findings in accordance with these principles.
Appellant first claims that the evidence was insufficient to establish that the conditions which led to the placement of the children would not or could not be remedied within a reasonable period of time with the provision of reasonably available services. For support, appellant suggests that the services provided by CYS were merely a half-hearted attempt and that she could have improved her parenting problems if CYS would have provided her with an intensive PACT[16] program. We disagree.
The record reveals that CYS initially became involved with the children because of the deplorable living conditions of appellant's residences, the children's gross lack of proper hygiene, and the developmental delays experienced by M.T., R.T., and H.T. Findings of Fact set forth in Opinion and Order, dated 3/14/91, at paragraphs 8-15; N.T. 12/20/90 at 6-7, 12-14, 32-33, 36, 39, 43-45, 46-48, 53; N.T. 12/21/90 at 24, 26-28, 49-51, 58-61, 67, 69, 75-78, 139, 150; and N.T. 2/1/91 at 48-50 and 54.[17] Despite repeated *387 efforts[18] by CYS and the parent partners, these conditions did not substantially improve and eventually reached such a critical level as to necessitate a dependency adjudication for all three children. Findings of Fact set forth in Opinion and Order, dated 3/14/91, at paragraphs 15-16; N.T. 12/20/90 at 31-33, 36-39; and N.T. 12/21/90 at 24-28.
Although appellant was directed by the court to remedy the conditions which led to the dependency hearing, appellant did not avail herself of this opportunity. The living conditions of appellant's residence and the children remained essentially unchanged. The children were dirty, lice-infested and undisciplined, and had been left alone or in the care of irresponsible juveniles; appellant's house also lacked heat, contained broken windows and a broken front door, and was filthy. Findings of Fact set forth in Opinion and Order, dated 3/14/91, at paragraphs 17, 19 and 21; N.T. 12/20/90 at 43-49, 53; and N.T. 12/21/90 at 139, 146, 148, 150-151, 155-156. The children were also subjected to physical, and in the case of R.T., sexual abuse. Findings of Fact set forth in Opinion and Order, dated 3/14/91, at paragraph 22; N.T. 12/20/91 at 56 and 64; N.T. 12/21/90 *388 at 156-158; and N.T. 2/1/91 at 66. More importantly, appellant missed numerous parenting classes in which she had been directed to participate, and did not attend her appointments with various agency personnel and her parent partner, Mrs. Stiber. N.T. 12/21/90 at 154; Findings of Fact set forth in Opinion and Order, dated 3/14/91, at paragraph 21; and Order, dated 10/4/89, at 2. Appellant also did not put forth serious effort to locate either employment or suitable housing for the children. N.T. 12/20/90 at 62 and N.T. 12/21/90 at 148.
Because of appellant's continued lack of progress and the physical abuse inflicted on the children, CYS finally placed the children into foster care where they remained for approximately one year before CYS filed the termination petition. Throughout this period the conditions which led to the placement of the children and appellant's lack of effort to improve her parenting skills remained substantially unaltered. Specifically, a caseworker who observed appellant and her husband during their visits with the children indicated that appellant's "[h]ygiene is generally poor and [that when appellant and her husband were present] there is always an older [sic odor] in the room, [a] very strong oder [sic]." N.T. 2/1/91 at 60. Similar observations were made by Mrs. Stiber who testified that "this [i.e., lack of improved hygiene,] has been an ongoing problem. The hygiene has been poor. At times there was several times when their room had a distinct odor even after the parents had left...." N.T. 12/20/90 at 71. Appellant's lack of improved hygiene is further disclosed by the fact that H.T. and R.T. were found to be infested with lice after visiting with their parents. Petition for Involuntary Termination of Parent's Rights, filed 11/14/90, at paragraph FF; N.T. 12/21/90 at 163-164. Although the foster parents treated the children, this problem continued to recur until appellant and her husband were finally administered treatment. Petition for Involuntary Termination of Parent's Rights, filed 11/14/90, at paragraph FF; N.T. 12/21/90 at 165.
*389 In addition to correcting the hygienic problems, appellant was required to obtain suitable housing and employment, because the family had been evicted from their home just prior to the children's placement into foster care. Findings of Fact set forth in Opinion and Order, dated 3/14/91, at paragraph 17; N.T. 12/20/90 at 43. These conditions were likewise not remedied by appellant. During the course of these proceedings, M.T., Sr. was fired from his job because of absenteeism and both appellant and her husband had moved frequently, and lived with friends or relatives rather than in their own residence. N.T. 2/1/91 at 61 and N.T. 2/12/91 at 2-3; Findings of Fact set forth in Opinion and Order, dated 3/14/91, at paragraphs 32-33. At one point, appellant had also resided with a boyfriend who had physically abused her. N.T. 2/12/91 at 2.
Appellant also did not avail herself of the services and programs offered by CYS and other agencies. Although CYS repeatedly discussed the various parenting programs and service plans which were available to appellant, she either did not take advantage of these services, or if she did make an attempt, her attendance was sporadic as she missed numerous classes and appointments. N.T. 12/21/90 at 28-31, 40-42, 44-45, 154, 165-167; N.T. 2/1/91 at 57-58; N.T. 2/12/91 at 7, 9; Findings of Fact set forth in Opinion and Order, dated 3/14/91, at paragraphs 25, 27-28, 32 and 34. The record documents that appellant was unmotivated and uncooperative with the agencies and/or personnel involved and resisted their efforts. N.T. 12/20/90 at 62; N.T. 12/21/90 at 167, 169-171; N.T. 2/1/91 at 57-58; Findings of Fact set forth in Opinion and Order, dated 3/14/91, at paragraphs 28, 32 and 41; and Petition for Involuntary Termination of Parent's Rights, filed 11/14/90 at paragraph HH (in which appellant indicated to the caseworkers that she was not going to do anything which she did not like to do).
After reviewing the above testimony and findings, we are unpersuaded by appellant's attempt to shift the focus away from her own shortcomings by blaming CYS, and find her *390 allegations of CYS' failure to provide additional services to be unsubstantiated. See In re: J.W., 396 Pa.Super. at 393-395, 578 A.2d at 959-960 (1990). CYS' intervention in this case spanned the course of several years and involved the provision of a variety of services and programs. However, all attempts by CYS and other agencies to assist appellant were thwarted by appellant's lack of motivation and uncooperative attitude. Moreover, appellant's demonstrated inability or unwillingness to improve her own personal hygiene throughout the period of the children's placement in foster care provides strong indicia that the unsanitary and unhealthful conditions which contributed to the removal of the children will never be remedied regardless of the amount of parenting services/programs that could be offered to appellant. We therefore decline to disturb the trial court's findings and conclusions with respect to this issue.
In her second claim, appellant challenges the admission into evidence of the following items: (1) statements made by the children; (2) the psychological evaluation prepared by Robert Meacham; (3) the testimony of Cheryl Nierle; and (4) an order dated October 4, 1989. Appellant has not related the contents of the alleged evidence nor has she referred us to the portion of the record in which these documents allegedly appear. See Pa.R.A.P., Rules 2119(c) and 2132, 42 Pa.C.S.A. With regard to the second and fourth items, appellant's arguments consist of nothing more than legal conclusions which are unsupported by citation to any relevant authority. Despite the lack of substantial argument on these issues, we will nevertheless attempt to review the admissibility of the above evidence.
The first item of which appellant complains is the admission of hearsay statements made by the children. Although appellant does not refer us to specific statements, the statements appearing in the hearing transcripts primarily concerned R.T.'s and H.T.'s explanation as to the cause of their black eyes. N.T. 12/21/90 at 68[19] (R.T. indicated that *391 her black eye was caused by "daddy") and 79 (H.T. indicated that his black eye was caused by "mommy"). Statements made by the children during or after their visitation with their parents were also introduced. N.T. 12/20/90 at 67 (M.T. told his father that he "stinks" and stated to both parents to shut up and leave him alone); N.T. 12/27/90 at 100 and 115 (H.T. and R.T. both used profane language, i.e., they said "f  k you" to their respective foster mothers after visitations with appellant and her husband).
In support of her position, appellant cites us to this court's prior decision in Interest of Leslie H., 329 Pa.Super. 453, 478 A.2d 876 (1984), where we held that hearsay statements were not admissible in dependency proceedings. Leslie H. has been overruled, to an extent, by recent statutory enactment. 42 Pa.C.S.A. § 5986 and In re: A.M., 365 Pa.Super. 516, 530 A.2d 430 (1987). Further, Leslie H. is distinguishable in that this case does not involve hearsay statements pertaining to sexual abuse in a dependency hearing and Leslie H. does not address the issue of admissibility of miscellaneous hearsay statements in a termination of parental rights proceeding. We must therefore look elsewhere for guidance.
Appellee and the trial court both suggest that the introduction of the children's statements was permissible under the exception to the hearsay rule which provides for the admission of a party's admissions. While it is clear that the children are parties in a termination proceeding, we do not find the trial court's reasoning to be persuasive. If this were the rule, then hearsay statements would also be admissible in criminal or dependency proceedings in which children likewise may be deemed parties to the action. Further, there would have been no need for the legislature to enact special statutory exceptions for criminal or dependency proceedings if a child's hearsay statements were admissible pursuant to this exception. We therefore reject the approach suggested by the trial court and appellee.
The statements made by the children were undeniably hearsay and do not appear to fall within any of the recognized *392 exceptions to the hearsay rule.[20] Consequently, the trial court's admission of these statements into evidence was erroneous. However, we find this error to be harmless. See, e.g., Semieraro v. Commonwealth Utility Equipment Corp., 518 Pa. 454, 458, 544 A.2d 46, 47 (1988) (recognizing that not all trial errors constitute reversible error; the complaining party must demonstrate that an error was harmful before a new trial may be awarded); Hart v. W.H. Stewart, Inc., 523 Pa. 13, 16, 564 A.2d 1250, 1252 (1989) (an evidentiary ruling which did not affect the [decision] will not provide a basis for disturbing the [factfinder]'s judgment); and Commonwealth v. Bricker, 525 Pa. 362, 375, 581 A.2d 147, 153 (1990) (describing the harmless error rule; an error cannot be held harmless unless the appellate court determines that the error could not have contributed to the verdict).
The only issues involved in the termination proceedings were whether the conditions which led to the placement continued to exist, whether these conditions could be remedied within a reasonable period of time with the provision of reasonably available services, and if these factors have been met, whether termination would be in the best interests of the children. The children's statements regarding the cause of their blackened eyes was only relevant to establish why the children were initially taken into custody by CYS. However, these statements had no impact upon the question of whether the conditions for termination have been met. With regard to the children's statements during and after visitation with their parents, these statements are, at best, only marginally relevant to the issue of whether termination would or would not be in the children's best interests. Further, there was other properly admitted evidence introduced at the hearing, which we will discuss below, which also established the detrimental effect of appellant's *393 visits with the children. Because we are convinced that the few statements by the children could not have contributed to the trial court's decision, the error in admitting the statements was harmless.
Appellant next complains that the trial court erred in admitting the psychological evaluation compiled by Robert Meacham because it contained inadmissible hearsay. Appellant cites no authority to support this argument nor does she specifically refer us to the alleged hearsay statements contained in the evaluation. We find appellant's assessment to be erroneous.
Mr. Meacham was requested by the court to perform an evaluation of appellant's and her husband's parenting abilities. N.T. 12/21/90 at 92. He fully testified at the termination hearings and was subjected to extensive cross-examination as to the basis and results of his evaluation. Id. at 90-128. Moreover, his evaluation was derived from his personal observation of appellant and her husband, any information which appellant and M.T., Sr. may have supplied to Mr. Meacham, as well as testing which he performed. Id. at 907-106. Under these circumstances, we find appellant's arguments on this subject to be wholly specious and we discern no error in the admission of Mr. Meacham's evaluation.
The third item of evidence relates to the testimony of Cheryl Nierle, a coordinator for the Lycoming County Mental Health/Mental Retardation Agency. Appellant contends that Ms. Nierle's testimony was improperly admitted in violation of the confidentiality provisions of the Mental Health Procedures Act (MPHA), 50 P.S. § 7111. As correctly noted by appellant, this statute precludes the release of documents or their contents which contain information relating to a person undergoing treatment. Assuming, arguendo, that a violation of the MPHA occurred in this case, any error in admitting this evidence must be deemed *394 harmless as it relates to these proceedings.[21]See, e.g., Semieraro v. Commonwealth Utility Equipment Corp., Hart v. W.H. Stewart, Inc., and Commonwealth v. Bricker, supra.
The final matter raised by appellant relates to the introduction into evidence of the Order, dated 10/4/89. Appellant contends that the factual determinations which are set forth in the order have the potential of being derived from hearsay statements, thus rendering the entire order inadmissible. Appellant does not indicate which of the factual findings set forth in the Order are derived from hearsay statements nor does appellant refer us to any relevant authority which would preclude the admission of prior related orders into evidence. Because all of the witnesses whose testimony was discussed in the order provided substantially similar testimony at the termination hearings, the error in admitting the order, if any, was harmless. See, e.g., Semieraro v. Commonwealth Utility Equipment Corp., Hart v. W.H. Stewart, Inc., and Commonwealth v. Bricker, supra.
Having addressed the issues raised by appellant, we must ascertain whether the trial court's decision to *395 terminate appellant's parental rights is supported by clear and convincing evidence. Before termination can be ordered, the court must find that:
(1) the child has been removed from parental care for at least six months;
(2) the conditions which led to the child's removal or placement continue to exist;
(3) the parents cannot or will not remedy the conditions which led to [the] removal or placement within a reasonable period of time;
(4) the services reasonably available to the parents are unlikely to remedy the conditions which led to [the] removal or placement within a reasonable period of time; and
(5) termination of parental rights would best serve the needs and welfare of the children.
In Re: B.J.R., 397 Pa.Super. at 14, 579 A.2d at 908 (1990). See also 23 Pa.C.S.A. § 2511(a)(2) and (a)(5). We further recognize that "[t]he fifth factor, whether termination would best serve the needs and welfare of the child, is not a mere formality flowing from the existence of the preceding four elements[,] but is ... a discrete consideration." In Re: B.J.R., supra, citing In Re: P.A.B., 391 Pa.Super. 79, 85, 570 A.2d 522, 525 (1990), allocatur granted, 526 Pa. 649, 585 A.2d 469 (1991). All of these elements have been established here.
The record reveals that the children were removed from appellant's care in October, 1989. As we previously discussed, the conditions which led to the children's placement into foster care resulted from the children's continuously filthy appearance and the unsanitary living conditions in appellant's residence. Evidence of physical and possible sexual abuse as well as appellant's neglect of the children by leaving them unattended or in the care of juveniles were additional factors which contributed to the children's removal. It was also established that these conditions had not been, and could not be, remedied by the parents. Appellant has demonstrated a continued inability or unwillingness to *396 improve her own personal hygiene. Further, appellant has not secured and maintained stable employment for herself or housing for the children, as appellant has remained unemployed, despite the removal of the children, and has continuously moved to the homes of her relatives and friends. In view of appellant's lack of progress in her own life, it is extremely doubtful that she will develop the ability to provide and maintain her children and their environs in a clean and sanitary condition.
With regard to the services provided by or available to appellant through CYS, it was noted that appellant was uncooperative and resistant to the agencies' attempts to assist appellant. Moreover, appellant was frequently absent from the few classes or programs that she was directed to attend. Under these circumstances, it is unlikely that further agency programs or services would be effective in remedying the conditions which led to the children's placement.
Having concluded that the initial four elements set forth in In re: B.J.R., supra, have been met, we must next determine whether the needs and welfare of the children would be best served by termination. With regard to this question, the testimony at the hearing indicated that the children all have special needs. Dr. Kelsey, a psychologist who evaluated both the children and appellant, indicated that H.T. has aggressive tendencies. N.T. 2/1/91 at 17 and 25 (in which Dr. Kelsey related that H.T. strenuously kicked the stairs leading to his (Dr. Kelsey's) office for no apparent reason). Dr. Kelsey also observed that H.T. has a lowered level of intelligence and behavioral problems which will require him to be placed in specialized educational programs well into the future. Id. at 17, 18-19 and 21. Dr. Kelsey concluded that the success of these programs, or lack thereof, would be intertwined with H.T.'s home environment. Dr. Kelsey did not believe that appellant would be able to provide the necessary reinforcement to assist H.T. in a meaningful manner. Id. at 19 and 21. Dr. Kelsey *397 added that a stable home situation was a necessity if there was to be any chance of altering H.T.'s behavior. Id. at 31.
Dr. Kelsey reached similar conclusions with regard to M.T., who had a significant speech impediment, extreme hyperactivity which required medication, and a borderline IQ. Id. at 33-35. M.T. also has aggressive and/or behavioral problems as evidenced by the fact that he struck Dr. Kelsey on the head within minutes of meeting him, broke window blinds in the doctor's office, and was described as a "whirling dirvish [sic]." Id. at 25. Dr. Kelsey was pessimistic regarding M.T.'s future and expressed his belief that M.T. was "extremely at risk for not functioning very well as an adult." Id. at 33 and 35. Dr. Kelsey believed that M.T. would have to be placed in intensive special education classes for a long period of time if M.T.'s problems were to be alleviated. Id. at 34.
Dr. Kelsey also evaluated R.T. Unlike her brothers, R.T. was not found to be hyperactive. However, she did have a speech impediment. Id. at 36. Dr. Kelsey further diagnosed R.T. as having a significant life circumstance problem that stemmed from her prior life with appellant. Id. at 36-37.
Because of the children's behavioral and other problems, Dr. Kelsey believed that appellant lacked the necessary abilities to control the children. Id. at 40. Dr. Kelsey's assessment was corroborated by Susan Krise, a CYS caseworker. In describing appellant's visits with her children, Mrs. Krise testified:
[B]asically the visits are very chaotic. The parents are not able to control the children's behavior during visits. The Parent Partner or myself needed to structure activity because when the kids are left to act on their own they become destructive, and there's a lot of hitting each other, hitting the parents, just being really unruly, so it helps to have activities planned for them to do.... The boys both exhibit difficult behavior during the visits. I've noticed a lot of hitting, a lot of verbal abuse towards their parents, a lot of anger directed, especially to their *398 mother ... They're very emotionally charged visits where there's constant turmoil, where [the children are] crying or they're whining or they're screaming, and this happens with all three of the children. It seems [that R.T.] does okay in her foster home[22] but when she comes into the visits ... I've noticed that her behavior seems to go downhill the longer we're in with all of them interacting together.... [At one particular visit,] I was concerned because the kids ran wild in the halls, were up and down the stairs, and [appellant] was chasing after [the children] as they were all three going in different directions. They were yelling and screaming and I felt [that it] was a very chaotic time.... [The children] were much calmer ... [when] they were [a]ble to, you know, play in the visiting room, but when given unstructured time and unsupervised time, that's when the trouble was going on.
Id. at 58, 59 and 62-63. Similar observations were made by Mrs. Stiber, the parent partner. N.T. 12/20/90 at 66 (describing the visits as utter chaos, with the children throwing toys, jumping off of the furniture and kicking the walls; appellant's inability to discipline the children required the intervention of the parent partner to re-establish control and discipline the children).
It was further observed by both Mrs. Krise and Mrs. Stiber that the children did not respond to their parents' attempts to hug and kiss them. While R.T. tolerated the displays of parental love, H.T. and M.T. fought against it. N.T. 12/20/90 at 68, 70; N.T. 2/1/91 at 58-59. Dr. Kelsey similarly noted a lack of affection between the children and their mother. N.T. 2/1/91 at 14 and 16.
Mrs. Krise also indicated that appellant often did not interact with her children but talked with the parent partner or the caseworker during the visits. N.T. 2/1/91 at 60. Dr. Kelsey further testified that the children ignored appellant's attempts to engage their interest and that they appeared *399 to be more interested in the toys that were present than in their mother. Id. at 14, 15-16 and 28. Mr. Meacham observed that the children's father played with the toys while the children ran around the room, hitting each other and that neither appellant nor her husband attempted to interact with the children. N.T. 12/21/90 at 104-105. Instead, they waited until the children misbehaved and then would react by yanking the children's arms, pulling them away from the situation and yelling at them or threatening them with "time out". Id. at 105-106.
In addition to these observations, CYS personnel, the children's foster parents and the other individuals working with the children have noted the improvement in the children's behavioral and other problems since their removal and placement in foster care. N.T. 12/21/90 at 171; N.T. 12/27/90 at 98-99, 101-102, 107, 112-114; 2/1/91 at 53-54; N.T. 2/12/91 at 16-18; and Findings of Fact set forth in Opinion and Order, dated 3/14/91, at paragraphs 42-43. See also Order, dated 9/18/91 (noting the children's dramatic progress after contact with their biological parents ceased). In addition, there was some evidence of regression in the children's behavior after visits with their parents. For example, both foster mothers of the children observed that H.T. and R.T. defecated in their underwear and used obscene language after visits with appellant. N.T. 12/27/90 at 99-100 and 114. M.T. reacted to parental visitation by becoming withdrawn or by engaging in angry tirades. Id. at 105.
The above evidence persuades us that termination would best serve the needs and welfare of appellant's children. These children have special needs which will require their enrollment in intensive special educational programs for a long period of time if they are to become functioning adults. Unfortunately, appellant lacks the requisite abilities to care for her children, even at the most basic physical level. It is thus unlikely that she will ever be able to supply the specialized care and instruction which the children will need as they develop. Further, M.T.'s and H.T.'s behavioral *400 problems require firm control and discipline which appellant is simply unable to impart. There is also no evidence of a strong emotional bond between the children and their mother in this case. As we have previously recognized, the state should not "seek to preserve a relationship in law which no longer exists in fact, with the result that the child[ren] [are] consigned indefinitely to the limbo of foster care or the impersonal care of institutions." In re: B.J.R., 397 Pa.Super. at 28, 579 A.2d at 915, citing In re: P.A.B., 391 Pa.Super. at 88, 570 A.2d at 526 and In re: William L., 477 Pa. 322, 348-349, 383 A.2d 1228, 1241 (1978), cert. denied, 439 U.S. 880, 99 S.Ct. 216, 58 L.Ed.2d 192 (1978). Finally, the children's developmental progress since their removal from appellant's care and the noticeable regression of the children's behavior when visiting with appellant serve as additional indicia that termination would best serve the needs and welfare of the children.
In sum, we have sedulously examined appellant's claims of error in light of the certified record and determined that the chancellor's findings were supported by clear and convincing evidence. Because the requisite elements for termination have been established by clear and convincing evidence, and because the children's needs and welfare would be best served by termination, we affirm the decree.
Decree affirmed.
NOTES
[1] M.T., Sr. is the father of the children; L.T. is the mother.
[2] M.T., Jr. will be referred to as M.T. for clarity. M.T. is a male child whose date of birth is September 3, 1984. M.T. is approximately seven and one-half years old at this time. M.T. was described as "an unpleasant case." N.T. 2/1/91 at 32. M.T. is extremely hyperactive and was placed on Ritalin to control this condition. Despite the medication, M.T. is an incredibly difficult child to control. Id. at 25-27. See also N.T. 2/12/91 at 16-18. In addition to his hyperactivity, M.T. is physically aggressive and was diagnosed as having an attention deficit, a borderline IQ and a significant speech impediment. N.T. 2/1/91 at 25 and 33-35.

See notes 3-4 on page 273.
[3] R.T. is a female child whose date of birth is September 17, 1985. R.T. is approximately six and one-half years of age at this time. Although calmer than her brothers, R.T. also has a speech impediment and borderline intellectual functioning. N.T. 2/1/91 at 36.
[4] H.T. is a male child whose date of birth is December 10, 1986. H.T. is approximately five years old at this time. H.T. has an attention deficit disorder, hyperactivity, a lowered level of intelligence, speech problems and developmental delays. N.T. 2/1/91 at 16-17, 35-36 and 54. H.T. is also physically aggressive. Id. at 17 and 25.
[5] Specifically, the family was using a space heater and the oven for heat. In addition, wires leading to the refrigerator were in such poor condition that they began to smolder and the refrigerator had to be unplugged to prevent the ignition of an electrical fire. N.T. 2/1/91 at 49-50.
[6] These juveniles were found to be in possession of amphetamines while in appellant's house. Appellant permitted these juveniles, as well as the other juvenile runaway, to baby-sit her children. N.T. 12/21/90 at 155 and Petition for Involuntary Termination of Parent's Rights, filed 11/14/90, at paragraph O.
[7] Following the entry of the court's order, the children have remained in foster care and CYS is seeking prospective families to adopt the children. The children have developmentally progressed while in their foster homes. During the pendency of this appeal, the parents have agreed to cease visitation, an event which appears to have had a positive effect upon the childrens' behavior and development.
[8] We have examined the certified record and are unable to locate the exceptions therein. Moreover, the exceptions are not identified on the docketing statement supplied by the trial court.
[9] M.T., Sr. was not identified as a party in appellant's notice of appeal. M.T., Sr. also has neither joined in this appeal nor instituted his own separate appeal. Because M.T., Sr. is not a party to this appeal, that portion of the decree terminating M.T., Sr.'s parental rights is not before us for review.
[10] Specifically, appellee has included two orders, dated March 20, 1991 and September 18, 1991, which review the children's current status and developmental progress while in their foster homes.
[11] The certified record submitted to this court contains the following documents: (1) Opinion in Response to Concise Statement of Matters Complained of on Appeal, filed May 21, 1991; (2) Concise Statement of Matters Complained of on Appeal, filed May 7, 1991; (3) Order (directing appellant to file a concise statement of matters complained of on appeal), dated April 24, 1991; (4) Notice of Appeal, dated April 17, 1991; (5) Verified Statement under [Pa.R.A.P.,] Rule 551 (regarding appellant's indigent status), filed April 22, 1991; (6) Order (denying exceptions to decree nisi), dated April 2, 1991; (7) Opinion and Order (adjudication and decree nisi), dated March 14, 1991; (8) Order (providing for the continuation of the termination hearing), dated February 1, 1991; (9) Order (providing for the continuation of the termination hearing), dated December 28, 1990; (10) Order (providing for the scheduling of the hearing on the termination petition), dated November 14, 1990; (11) Petition for Involuntary Termination of Parental Rights, filed November 14, 1990; (12) Transcript of Termination Hearing, dated February 1, 1991; and (13) Transcript of Termination Hearing, dated February 12, 1991. In addition, we have received a supplemental record which consists of two copies of appellant's praecipe to enter the decree nisi as a final decree, filed October 30, 1991.

A review of the above materials reveals that the transcripts of the hearings conducted on December 20, December 21 and December 27, 1990 and the fourteen exhibits admitted at the hearings have not been included with the certified record. Also absent are the exceptions allegedly filed on appellant's behalf, in addition to any materials which may have been filed by the attorney who was appointed to represent the children in these proceedings.
[12] Appellant's indigent status does not impinge upon her ability to obtain a complete transcript because the county, not appellant, pays for the cost of transcription. See Pennsylvania Rules of Judicial Administration (Pa.R.J.A.), Rule 5000.2(h), 42 Pa.C.S.A.
[13] While we have obtained these items through our own efforts, "we... remind [appellant's] counsel that it is not the responsibility of this court to obtain a copy of the trial transcript [or the exhibits] for the purpose of reviewing the client's claims." Commonwealth v. Osellanie, 408 Pa.Super. at 476, 597 A.2d at 132 (emphasis added).
[14] In her brief, appellant further states that she is appealing from the decree nisi and that the decree nisi was entered as a final decree pursuant to the trial court's order of April 2, 1991. Appellant's Brief at 2 (Order in Question). As explained above, appellant's assessment is erroneous.
[15] As we previously indicated, we have been unable to locate appellant's exceptions in the certified record. Because the trial court entered an order denying appellant's exceptions, we conclude that the exceptions were in fact timely filed and reviewed by the lower court.
[16] Parents and Children Together. N.T. 12/20/90 at 41.
[17] Because of the lengthy testimony, we will not directly quote from the trial transcripts. We have nevertheless summarized the essential details of this testimony in the following manner. The living conditions in appellant's various residences were unkempt in that dirty dishes, clothes, trash and other debris were strewn therein. Windows were broken out in each of the dwellings in which appellant had lived. A lack of running water was also observed at the trailer in which appellant lived. Appellant's apartment lacked a proper heat source and a space heater and the kitchen oven were used for heat. Also in the apartment, there were electrical wires running under a carpet which smoldered and there was a hole in the floor which constituted a safety hazard. In addition, appellant, her husband and her residences were all extremely malodorous. With regard to the children, they were all unkempt and very dirty in that their hair was uncombed, their hands and feet were black and they had dirt under their fingernails. The children's clothing was also dirty. In addition, the children were found to be infested with lice on several occasions. Further, the children were undisciplined, wild and chaotic as they were permitted to run around the house and they kicked, threw and/or hit various objects, their mother or their siblings. H.T. had been sent to school in feces and/or urine caked/soaked diapers and had to be regularly bathed by school staff. The children all exhibited developmental delays in that their ability to perform certain tasks was well below the normal level for children who were the same chronological ages as M.T., R.T. and H.T. The children were also observed to have significant speech impediments.
[18] CYS' earlier attempts to assist the children were thwarted by appellant's and/or her husband's resistance. Findings of Fact set forth in Opinion and Order, dated 3/14/91, at paragraphs 8 and 11 and N.T. 12/20/90 at 11, 21-25, 33 and 37.
[19] We observe that there are two pages both labeled 68 in the transcript. We are here referring to the first page 68 which appears.
[20] However, the statements regarding the source of R.T.'s and H.T.'s black eyes arguably could have been admissible not to prove the truth of the matter asserted, i.e., that appellant or M.T., Sr. hit the children, but as part of the explanation as to why the children were placed in foster care by CYS.
[21] We have thoroughly reviewed Ms. Nierle's testimony and find therein no disclosure of any confidential matters relating to appellant's and/or her husband's treatment. To the extent that the admission of Ms. Nierle's testimony may have violated the MPHA, the error was harmless because nothing therein affected the trial court's decision. Ms. Nierle merely related that she met appellant and her husband to ascertain the nature of their request for assistance. N.T. 12/21/90 at 38-39. Although numerous appointments with appellant and/or her husband were scheduled, appellant failed to keep any of these appointments. Id. at 39-41. Consequently, no treatment, therapy or counseling of any type was ever administered to appellant or M.T., Sr. Id. at 44. The remainder of Ms. Nierle's testimony described her observations of appellant's and M.T., Sr.'s exhibition of poor personal hygiene. Id. at 45. Appellant's lack of cleanliness and failure to utilize the various programs/services was introduced into evidence through the testimony of other witnesses, however. Consequently, Ms. Nierle's testimony on this subject was merely cumulative to the other evidence which was introduced. Because appellee's other evidence was more than sufficient to sustain the termination decree, the error, if any, in admitting Ms. Nierle's testimony was harmless.
[22] R.T. is not in the same foster home as her brothers. H.T. and M.T. have been placed with the same foster family, however.