J-S93017-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: AI.A. AND AS.A., MINOR CHILDREN | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: A.B., MOTHER | No. 3770 EDA 2015 |

Appeal from the Orders Entered October 22, 2015
In the Court of Common Pleas of Philadelphia County
Family Court at No(s): CP-51-DP-0000357-2013
CP-51-DP-0000527-2013

BEFORE:  DUBOW, J., SOLANO, J., and PLATT, J.[*]

MEMORANDUM BY SOLANO, J.:              **FILED FEBRUARY 14, 2017**

A.B. ("Mother") appeals from the October 22, 2015 orders adjudicating her daughters, Ai.A., born September 2004,[1] and As.A., born August 2010,[2] (collectively, "the Children") as dependent.[3]  Upon careful review, we affirm.

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] Ai.A.'s family court case number is CP-51-DP-0000357-2013.

[2] As.A.'s family court case number is CP-51-DP-0000527-2013.

[3] Mother filed one appeal from two separate orders.  Family Ct. Op., 4/26/16, at 1 n.1.  We discourage counsel from filing one appeal from two orders, but because it does not impede our review, we decline to quash. **TCPF Ltd. v. Skatell**, 976 A.2d 571, 574 n.4 (Pa. Super. 2009).

Mother and the Children's father, C.A. ("Father") — collectively, "Parents" — were divorced in 2011. N.T., 10/22/15, at 78-79.[4] For about a year after the divorce, Mother attended mental health therapy.

On April 17, 2011, the Department of Human Services ("DHS") received a Child Protective Services ("CPS") report (as supplemented, "the 2011 CPS Report") that Ai.A. had been sexually abused by her biological brother ("Brother"), who is nine years older than Ai.A. **See** Dependency Pet., 2/20/13, at ¶¶ b-f.[5] The 2011 CPS Report stated that the sexual abuse may have begun two years earlier, when Ai.A. was four years old. Although Brother had been temporarily removed from Mother's home and was living with a family member, that family member could not continue to care for him, and he returned to Mother's home in March 2012. On May 2, 2012, DHS received a General Protective Services ("GPS") report that Brother had been indicated as a perpetrator of sexual abuse against Ai.A.[6] In early May

_____

[4] The record is unclear as to the physical and legal custody of the Children after the divorce. However, Mother appears to have had physical custody of the Children, based upon the Dependency Petition for Ai.A., dated February 20, 2013, which states, "Location of Child at Filing: [A.B.], mother," and upon the Application for Order of Protective Custody for As.A., dated March 13, 2013, which lists the same address for As.A. and Mother.

[5] None of the CPS reports involving the Children were made part of the certified record.

[6] The GPS report, 5/2/12, is not in the certified record.

2012, Mother removed Brother from her home and placed him in the care of Youth Emergency Services and, later, Baptists Children's Services.

On December 14, 2012, DHS received another CPS report ("the 2012 CPS Report") that Ai.A. was inappropriately touched by R.Z., the son of Father's girlfriend ("Father's Girlfriend").[7] **See** Dependency Pets., 7/24/15, "Statement of Facts," at ¶ b.[8]

On February 20, 2013, DHS filed a dependency petition for Ai.A. On March 7, 2013, the family court entered an order declaring Ai.A. dependent but allowed her to remain in Mother's physical custody, subject to DHS's supervision.

"On March 11, 2013, DHS received a CPS report which alleged that [Mother] punched [Ai.A.] in the face, causing a bruise, and that [Mother] was physically and emotionally abusive to the [C]hildren and suffered from mental health problems." Dependency Pets., 7/24/15, "Statement of Facts," at ¶ c. Two days later, on March 13, 2013, DHS applied for and obtained orders of protective custody for the Children, and DHS assigned Herbert Brooks as the Children's social worker. N.T. at 10. The next day, a shelter

_____

[7] R.Z. was seventeen years old as of the date of the dependency hearing and the orders at issue. N.T. at 50.

[8] Although separate dependency petitions were filed on July 24, 2015 for Ai.A. at Docket No. 357-2013 and for As.A. at Docket No. 527-2013, their content is identical. **See** Dependency Pets., 7/24/15 (unpaginated). Paragraph citations therefore apply to both petitions.

care hearing was held, and the family court concluded that it would be contrary to the welfare of the Children and against their best interests for them to remain in Mother's home. Family Ct. Op., 4/26/16, at 3, 9 (citing Shelter Care Orders, 3/14/13, at 1; N.T. at 17-18). The Children were placed in foster care through Elwyn, a human services organization.

On March 26, 2013, after a hearing, the family court entered a permanency review order for Ai.A. in which it concluded that Ai.A. was safe in the current placement setting, *i.e.*, foster care through Elwyn. Permanency Review Order, 3/26/13, at 1. The family court also entered a continuance order for As.A. Continuance Order, 3/26/13, at 1. Both orders granted Mother supervised visits and ordered her to receive a parenting capacity evaluation. Permanency Review Order, 3/26/13, at 1; Continuance Order, 3/26/13, at 1.

Mother's behavior during these court-ordered supervised visits was "inappropriate," because she did not want an agency worker walking with her during the visits. Family Ct. Op. at 8-9 (citing N.T. at 16, 20); **see also** N.T. at 77-78. Moreover, although Mother attended the ordered parenting capacity evaluation, she stayed on the telephone throughout the evaluation. When DHS asked her to hang up her phone, she refused, and the evaluation was never completed.

Following permanency review hearings on April 25, June 6, September 5, and November 6, 2013, the family court continued to keep the

Children in foster care. Meanwhile, between 2013 and 2014, Mother again sought mental health therapy. N.T. at 79-80.[9] On February 6, 2014, physical custody of the Children transferred to Father, but DHS retained legal custody. Permanency Review Orders (Non-Placement), 2/6/14, at 1.

On April 29, 2014, following another hearing, the family court decided that the Children were no longer dependent. Mr. Brooks ceased serving as the Children's DHS social worker at this time. N.T. at 10-11.

There is nothing in the court record regarding the Children again until July 20, 2015, when DHS received a CPS report ("the 2015 CPS Report") alleging that R.Z. (the son of Father's Girlfriend) had been sexually abusing Ai.A. for several weeks. These allegations were similar to those in the 2012 CPS Report. Dependency Pets., 7/24/15, "Statement of Facts," at ¶ e. "[Ai.A.] stated that the recent sexual abuse has happened five times at the family's home." *Id.* The 2015 CPS Report alleged that because Father and Father's Girlfriend did not believe Ai.A. when she had reported the earlier incidents of abuse, Ai.A. had recanted her statements about the earlier abuse to avoid disrupting the family and again being placed in foster care. Family Ct. Op. at 6. In addition, the 2015 CPS Report alleged —

> that [R.Z.] lives primarily with his [biological f]ather but visits his mother, [Father's girlfriend]; that Ai.A. has post-traumatic stress disorder (PTSD) and is receiving counseling; that Father is

---

[9] In her testimony, Mother could not be more specific about the dates. N.T. at 79-80.

employed and [Father's Girlfriend] is pregnant; that there are a number of adults and children who reside in the home; and the Children have had limited contact with A.B., Mother, during the last two years.

Family Ct. Op. at 7.

On the day of the 2015 CPS Report, DHS visited Father's home and met with Father's Girlfriend while her son and Father were not home. Dependency Pets., 7/24/15, "Statement of Facts," at ¶¶ f-h; N.T. at 55. The next day, Father brought Ai.A. to DHS and requested that she be placed in foster care. Later that day, DHS obtained orders of protective custody for the Children and placed them together in a foster home through Asociacion Puertorriquenos En Marcha ("APM").

On July 23, 2015, after holding a shelter care hearing, the family court returned legal custody of the Children to DHS. Family Ct. Op. at 8 (citing Shelter Care Orders, 7/23/15, at 1). The family court stated that it did not consider Mother to be an appropriate resource. The Parents were granted supervised visits twice weekly. Shelter Care Orders, 7/23/15, at 2.

The next day, DHS filed dependency petitions for the Children. The court held a hearing on those petitions on October 22, 2015, at which both Parents were present. Family Ct. Op. at 8 (citing N.T. at 8-12). Because Mother raises several issues about the conduct of that hearing, we recount it at some length.

The court first heard testimony from Mr. Brooks, who told the court that specific orders had been entered regarding Mother. N.T. at 11-12. The following exchange then occurred:

**Q:** What were some of the orders that she — the Department needed her to do and the Court had requested her to do?

**A:** One of the orders was that Mother would have a parenting capacity evaluation. Mother did have — she did attend the evaluation, but we received some information . . . that Mother was inappropriate during the evaluation.

*Id.* at 12. Mother's counsel then objected. *Id.* When the family court inquired about the nature of the objection, Mother's counsel replied that "it's certainly hearsay. If there's Court orders, . . . then they're in the record." *Id.* at 12-13. DHS' counsel explained that this case had previously been before the family court in 2014, and Mother's counsel again objected. *Id.* at 13. DHS' counsel continued that "it relates to dependency issues with Mother." *Id.* The family court overruled the objection. *Id.* Mother's counsel replied that "[t]here was an expungement, and [he had] a copy of the order. . . . [His] objection [was] to references to anything that was covered by the expungement order." *Id.* at 14-15.[10] The family court again

---

[10] On August 29, 2013, an expungement order was entered by the Commonwealth of Pennsylvania, Department of Public Welfare, Regional Manager, Bureau of Hearings and Appeals, "In the Appeal of : R.A. In re: A.A., ChildLine No.: 510179918, BHA Docket No.: 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." A copy of it is included in the court record for Ai.A., at Docket No. CP-51-DP-0000357-2013, and labelled "DHS-1." No additional information, such as when it was
*(Footnote Continued Next Page)*

overruled the objection. *Id.* at 15. Later in his testimony, Mr. Brooks stated that Mother was never in compliance with her mental health treatment. Family Ct. Op. at 9 (citing N.T. at 17).

DHS' counsel also asked Mr. Brooks about Mother's supervised visits, and Mr. Brooks testified about what an "agency worker reported." N.T. at 19. Mother's counsel objected, and after confirming that Mr. Brooks "c[a]me by this knowledge" from his "review of the records," the family court overruled the objection. *Id.* Mother's counsel objected again, citing Pa. R. Evid. 803(6), 1003, relating to "best evidence and business records" and "how to substantiate them by producing the records in court." *Id.* The family court again overruled the objection. *Id.*

During cross-examination, Mr. Brooks stated that he did not have the DHS records upon which he relied with him in court. N.T. at 24. The following exchange then occurred:

> **[MOTHER'S COUNSEL]:** And so all your testimony is from your recollection?
>
> **MR. BROOKS:** Well, we did – I did speak with our attorney, yes. . . . I did remember some of it, yes.
>
> **[MOTHER'S COUNSEL]:** Some of it, but not all of it?
>
> **MR. BROOKS:** Not all of it.

---
*(Footnote Continued)*

introduced as an exhibit or to what incident it refers, is included in the record.

**[MOTHER'S COUNSEL]:** Can you say which parts you did not recall, except for going over the records with your attorney?

**MR. BROOKS:** No. I can't say what I did not recall.

**[MOTHER'S COUNSEL]:** It's kind of mixed together?

**MR. BROOKS:** I did not recall.

*Id.* at 25-26. At the end of the cross-examination, the family court related:

> And for the record, I have an independent memory of those events that occurred that resulted in my discharge of the [C]hildren to the [F]ather. And the testimony regarding the Mother's activities and compliance were part of the hearings that were conducted before me prior to that date. . . . There are certain responsibilities, which I'm sure you're aware of, Counsel, to review the record, so that you have a complete picture of the case.

*Id.* at 27-28.

Next, the family court heard from Jennifer Brerton, Ai.A.'s trauma-focused therapist at Children's Crisis Treatment Center for over two years. N.T. at 29-30, 36-37. Ai.A. was referred to that Treatment Center due to a history of sexual abuse and was still in therapy at the time of the hearing. Ms. Brerton testified that Ai.A. told her that in addition to being sexually abused by R.Z., she had been sexually abused by Brother. *Id.* at 30-31. Ms. Brerton also described her sessions with the Parents. She stated, "At times, Mother acknowledged the alleged sexual abuse by [R.Z.]; but at times, varied with acknowledging the sexual abuse by [Brother]." *Id.* at 31-32. Father, conversely, believed the allegations of sexual abuse against Brother but doubted the allegations against R.Z. *Id.* at 34, 37-38. During

cross-examination, Ms. Brerton clarified that Ai.A. has alleged "multiple incidents" by Brother "over a few year period." *Id.* at 40.

When asked during re-direct examination about Mother's contact with Ai.A., Ms. Brerton answered that "it's hard for me to speak to. I haven't had any contact with Mother since about two — a year-and-a-half, two years." N.T. at 46. DHS' counsel then asked Mr. Brerton whether she would recommend that the Parents have supervised or unsupervised visits with the Children, and Mother's counsel objected, arguing that, "regarding Mother, [Ms. Brerton] doesn't have any recent information." *Id.* at 47. The family court overruled the objection, and Ms. Brerton responded that she "would feel uncomfortable saying unsupervised visits." *Id.*

Shareena Johnson, the DHS social worker who investigated the 2015 CPS Report, subsequently testified. N.T. at 48. She recounted that DHS had determined that the report, with allegations against R.Z., was "unfounded," although she added that she "can't speak of what happened prior to [her] receiving this case." *Id.* at 49, 51.

When asked if she had any concerns about Mother being reunified with Ai.A., Ms. Johnson answered affirmatively. N.T. at 51.[11] When asked her

_____

[11] Similarly, when asked whether she had any "ongoing concerns" about Ai.A. being reunified with Father, Ms. Johnson replied, "The child expressed concerns to be around this perpetrator [R.Z.]. I can't speak of what happened prior to me receiving this case, but the child has concerns to — with the access that's allowed for [R.Z.]." N.T. at 51.

basis for this answer, she said that she "had the chance to go into the system and read prior reports." *Id.* Ms. Johnson mentioned "three indicator reports that Mother had for physical abuse, one with [Ai.A.]" *Id.* at 52. Before Ms. Johnson could continue, Mother's counsel objected, claiming "hearsay." *Id.* The family court replied, "Okay. You can cross-examine the witness." *Id.*[12] Ms. Johnson agreed that any concerns she had about As.A. living with Mother were "historical." *Id.* at 54. Ms. Johnson further testified that As.A. did not indicate any inappropriate contact with R.Z. *Id.* at 53. As of the date of the hearing, R.Z. lived with his father, not with his mother, but DHS did not have an address on file. *Id.* at 54.

At the end of DHS' case, Karima Muhammed, the APM case manager responsible for placing the Children in a foster home, testified that the Children's safety and needs were being met through their foster home. N.T. at 61.

After DHS concluded its case, Father testified that he had completed caregiver sessions with Ms. Brerton in the past and is willing to resume the sessions. N.T. at 75-76.

Finally, Mother testified that she knew that R.Z. no longer lived with Father and Father's Girlfriend, but she said she still did not want R.Z. around either of the Children. N.T. at 83. When asked if she believed Ai.A.'s

_____

[12] When given the opportunity to cross-examine Ms. Johnson, Mother's counsel stated that he had "[n]o questions." N.T. at 58.

allegations of sexual abuse by R.Z. and Brother, Mother answered, "I don't believe every story, no. . . . [A]t first I believed the story when she talked about [R.Z.]. . . . In the beginning, as a mother, you do. As a parent, you would think so. But as time went on, no." *Id.* at 80-81. When asked again, directly by the family court, whether she believed that her son, Brother, sexually abused Ai.A., she answered, "No." *Id.* at 85.

Mother presented no evidence about current or recent mental health treatment, parenting classes, anger management, or any other service showing that she was attempting to ameliorate any previously identified concerns. *See* N.T. at 77-92. When asked what she ultimately wanted for the Children, Mother testified that she thought that the Children "need to be with both of their parents [u]nsupervised." *Id.* at 86. Mother believed that she and Father "were good parents." *Id.*

At the conclusion of the dependency hearing, the family court granted the dependency petitions. Orders of Adjudication and Disposition — Child Dependent, 10/22/15, at 1.[13] The family court "found credible and persuasive the testimony of the DHS witnesses," but made no credibility determinations as to the Parents. Family Ct. Op. at 14. The family court

---

[13] Although two separate orders of adjudication and disposition were entered for Ai.A. at Docket No. 357-2013 and for As.A. at Docket No. 527-2013, their content is identical, except that Ai.A's order adds that APM must continue transporting Ai.A. to the Children's Crisis Treatment Center. Order of Adjudication & Disposition – Child Dependent, 10/22/15, Docket No. 357-2013, at 2.

concluded that it was in the best interests of the Children that they be removed from Father's home and placed in foster care. Orders of Adjudication and Disposition — Child Dependent, 10/22/15, at 1. It continued supervised visitation by the Parents. *Id.* at 2.[14]

On November 23, 2015, Mother timely filed a notice of appeal.[15] Her brief raises the following issues for our review:

> 1. Was [Mother] denied Due Process, [(A)] in that she was not served with Notice and Petition, and [(B)] in that inadmissible hearsay was the sole evidence presented by DHS?
>
> 2. Did DHS fail to prove grounds for dependency by "clear and convincing" evidence?

Mother's Brief at 4. We have reordered Mother's issues for clarity and will first address her service claim, then her challenge to the evidence, and finally her hearsay issues.

We consider Mother's issues in light of our well-settled standard of review:

_____

[14] On November 19, 2015, Mother filed a motion for reconsideration. No action was taken on that motion.

[15] Thirty days after October 22, 2015, was November 21, 2015 — a Saturday; November 23, 2015, was the first business day thereafter. Although the appeal was timely filed, there was considerable delay in the filing of the certified record in this Court. That record was due on December 23, 2015, but we did not receive it until April 27, 2016. Thus, the briefing schedule for this appeal was delayed for over four months. Such a delay is not acceptable, particularly in a Children's Fast Track appeal like this one.

The standard of review which this Court employs in cases of dependency is broad. However, the scope of review is limited in a fundamental manner by our inability to nullify the fact-finding of the lower court. We accord great weight to this function of the hearing judge because he is in the position to observe and rule upon the credibility of the witnesses and the parties who appear before him. Relying upon his unique posture, we will not overrule his findings if they are supported by competent evidence.

*In re D.A.*, 801 A.2d 614, 617–18 (Pa. Super. 2002) (*en banc*) (citation omitted).

On appeal, Mother first argues that she was not served with notice and with the dependency petition and that her due process rights therefore were violated. Mother's Brief at 10. However, Mother's Rule 1925(b) Statement said nothing about a lack of alleged service and notice.[16] Mother did include

---

[16] The lengthy Rule 1925(b) Statement raised these issues:

> 1.   Evidence was presented, and admitted by the court into evidence, of alleged child abuse. All of this was done in contravention of court order expunging those records, as counsel argued to the court.

> 2.   The majority of the evidence presented was hearsay, admitted over objection. A witness testified as to their recollection of records which they had read, but which were not presented in court. Proper foundation was not laid under Pa.R.E. 803(6) and 1002.

> 3.   Over objection, a witness was permitted to read from notes, without a proper foundation having been laid under Pa.R.E. 803.1(3). Furthermore, the notes were not provided to all counsel, though request was made to the court, nor were the notes offered into evidence.

*(Footnote Continued Next Page)*

in that Statement a claim that the trial court erred by "[d]enying Due Process of Law to . . . Mother, as guaranteed by the Constitutions of the Commonwealth of Pennsylvania and of the United States of America," Statement ¶ 6, but that claim was far too vague to preserve the specific service issue that Mother now presents. The family court held that the service issue was waived, Family Ct. Op. at 15, and we agree. As Mother did not properly preserve her claims as to service and notice in her Rule 1925(b) Statement, she cannot raise those claims on appeal to this Court. *See* Pa.R.A.P. 302(a); *In re C.P.*, 901 A.2d 516, 522 (Pa. Super. 2006). Hence, we decline to address this issue.

*(Footnote Continued)* ⎯⎯⎯⎯⎯⎯⎯⎯⎯

4. The adjudicatory and dispositional stages of the hearing were combined, in violation of the Juvenile Act.

5. Grounds for dependency were not proven by "clear and convincing evidence".

6. Denying Due Process of Law to . . . Mother, as guaranteed by the Constitutions of the Commonwealth of Pennsylvania and of the United States of America.

7. [Mother] reserves supplement the right to expand and to this Concise Statement, and to raise additional issues in her Appellant's Brief, for the following reasons:

a. Pursuant to Children's Fast Track Rules, this Concise Statement is being filed at the same time as is the Notice of Appeal and Order for Transcript,

b. Therefore, this Concise Statement must be prepared and filed without benefit of a copy of the Transcript.

Mother never supplemented this Rule 1925(b) Statement.

Next, we consider Mother's contention that "grounds for dependency were not proven by "clear and convincing evidence." Mother's Brief at 22. In the instant case, DHS alleged in its dependency petition that the Children were dependent as defined in 42 Pa.C.S. § 6302(1).[17] Dependency Pets., 7/24/15, at ¶ 6. That section defines a dependent child as one who:

> is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals. A determination that there is a lack of proper parental care or control may be based upon evidence of conduct by the parent, guardian or other custodian that places the health, safety or welfare of the child at risk, including evidence of the parent's, guardian's or other custodian's use of alcohol or a controlled substance that places the health, safety or welfare of the child at risk[.]

42 Pa.C.S. § 6302(1). Regarding an allegation of dependency, our Supreme Court stated in *In re M.L.*, 757 A.2d 849, 850–51 (Pa. 2000):

> A court is empowered . . . to make a finding that a child is dependent if the child meets the statutory definition by clear and convincing evidence. If the court finds that the child is dependent, then the court may make an appropriate disposition of the child to protect the child's physical, mental and moral welfare, including allowing the child to remain with the parents subject to supervision, transferring temporary legal custody to a relative or a private or public agency, or transferring custody to the juvenile court of another state.

*Id.*

_____

[17] 42 Pa.C.S. § 6302 enumerates ten different definitions of a "Dependent child." 42 Pa.C.S. § 6302(1)-(10). Only subsection (1), is at issue here.

We agree with and accept the family court's opinion as to its reasons

for finding the Children dependent:

> This [c]ourt found clear and convincing evidence to Adjudicate the Children Dependent pursuant to 42 Pa.C.S.A. §6302. The record demonstrates Mother's ongoing inability to provide parental care or control for the physical, mental, or emotional health, or morals of the Children.
>
> Ms. Johnson, DHS Social Worker, testified credibly she would have concerns with Mother being able to adequately protect As.A., because of her history of physical abuse. [N.T. at 54.]
>
> Another former DHS Social Worker, Mr. Brooks, testified that to his knowledge Mother was never in compliance with her mental health treatment. [N.T. at 17.]
>
> Further, Mother testified she did believe Ai.A. in the beginning about the sexual abuse, but as time went on she did not believe that [Brother] had abused her. [N.T. at 83.]
>
> * * *
>
> After hearing the credible testimony of the DHS witnesses, the [c]ourt concluded that "the [P]arents have a continuing issue regarding their acceptance of each other and they cast grave doubts on the credibility of one another. . . . And [the family court's] concern is that the Children would suffer as a result of the lack of priority by either parent to their safety and wellbeing." [N.T. at 93.]
>
> Further, the [c]ourt was guided by the testimony of the therapist and stated, "first there has to be therapy for the oldest Child. And [it has] had the benefit of the therapist's testimony over a number of hearings[18] and [it] find[s] her to be credible." [N.T. at 94.]

---

[18] The record is unclear as to whether the family court meant "a number of hearings" in these actions regarding the Children or "a number of hearings" involving the therapist in other cases.

- 17 -

> The [c]ourt reasoned, "The concern is that each parent diminishes the likelihood that [Ai.A.] was abused. There seems to be an ability to accept the fact that [Ai.A.] was abused by the other child, but not by my child. The reality is that [Ai.A.] was exposed and vulnerable to both of these potential perpetrators. And [the family court] find[s] it troubling that there's a desire to protect the adult and a lack of understanding of the necessity to protect the vulnerable Child and that disturbs [the court]. And that's why [it] find[s] that [the Parents] are not able to care for [Ai.A.] at present or protect [Ai.A.] at present. And the youngest Child will remain in placement because the failure to perceive the threat to the older Child must be taken into consideration when [the family court] consider[s] their ability to protect the youngest Child. Therefore, [the Children] will remain in care, in custody." [N.T. at 94-95.]

Family Ct. Op. at 12-13, 15-16.

We note that Mother presented no evidence contradicting the DHS witnesses. She provided no proof of current or recent mental health treatment, parenting classes, anger management classes, or other treatment. *See* N.T. at 77-92. We have reviewed the record and conclude that it supports the trial court's findings. Consequently, we hold that the family court properly found that DHS met its burden by clear and convincing evidence to adjudicate the Children dependent pursuant to 42 Pa.C.S. § 6302(1).

Mother next contends that "[t]he evidence presented by DHS to prove dependency was entirely inadmissible hearsay and should not have been allowed. This Court has long held that depriving a parent of the opportunity to confront and cross-examine adverse witnesses violates the constitutional right of Due Process." Mother's Brief at 8, 13. Mother continues:

Ms. Muham[m]ed testified as to the children being safe in the current placement, and not as to grounds for adjudication. [N.T. at 60-63.]

Ms. Brerton had been a [Children's Crisis Treatment Center] therapist for [Ai.A.] for about 2 ½ years. [DHS' counsel] asked her whether she had a recommendation. Her answer was that "as to mother, it's hard for me to speak to . . . I haven't had any contact with mother, since about 2 --1 and ½ -- 2 years. . . ." [N.T. at 46-47.]

[DHS' counsel] persisted, and asked if she would recommend visits. Mother's counsel objected, on the basis that "I think she said that she doesn't have any recent information". The court overruled that objection, and the witness finally speculated as to her concerns if mother was to have visits. [N.T. at 47-48.]

Ms. Johnson testified that she was assigned to investigate the CPS report of July 20, 2015. She said "... I can't speak of what happened prior to me receiving this case. .... I've had the chance to go into the system and read prior reports...[.]" [N.T. at 51-52.]

Mother's counsel objected, on the basis of hearsay, and that there had been an expungement order as to the CPS report. The court declined to sustain the objection, and instead offered "you can cross examine [the witness." N.T. at] 52.

Mr. Brooks was the chief witness for DHS. [During his direct examination, h]e said that his involvement with the case was "March 13, 2013 until December 13, 2013". [N.T. at] 10. During the course of his testimony, Mr. Brooks made mention of "prior orders" and similar references. Only at that point did it become apparent to mother's counsel that there had been a prior case involving this family, and that Mr. Brooks' testimony dealt with that prior case. [N.T. at] 10-12. . . .

Mother's counsel made at least five objections during the course of Mr. Brooks' testimony, all of which were overruled. To the extent that counsel was able to articulate his objections, he referenced "hearsay", "expungement", and "Rule of Evidence 803[(6)] and Rule [1003], best evidence and business records, how to – how to substantiate them by producing the records in the Court." [N.T. at 12-15,] 17, 19.

- 19 -

Upon cross-examination, Mr. Brooks acknowledged that the bases for his testimony were 1) records, which he did not bring to court with him, and 2) discussions with his attorney, including matters which were not in his recollection. Mr. Brooks candidly stated that he "could not say what he recalled was discussed with his attorney, versus what was from his recollections. [N.T. at 24-27.]

Mother's Brief at 17-19.

"The question of whether evidence is admissible is a determination that rests within the sound discretion of the trial court and will not be reversed on appeal absent a showing that the court clearly abused its discretion." **Moroney v. Gen. Motors Corp.**, 850 A.2d 629, 632 (Pa. Super.), **appeal denied**, 862 A.2d 1256 (Pa. 2004). "The basic requisite for the admission of any evidence is that it be both competent and relevant. Evidence is competent if it is material to the issues to be determined at trial, and relevant if it tends to prove or disprove a material fact in issue." **Id.**

Generally, a "witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may consist of the witness's own testimony." Pa. R. Evid. 602.

Hearsay "is an out-of-court statement offered to prove the truth of the matter asserted in the statement. The rule against admitting hearsay evidence stems from its presumed unreliability, because the declarant cannot be challenged regarding the accuracy of the statement." **Commonwealth v. Chmiel**, 889 A.2d 501, 532 (Pa. 2005) (citation

omitted). Even if a court erred by admitting hearsay, the appellant must still establish that the court's error was reversible error. *In re M.T.*, 607 A.2d 271, 280-81 (Pa. Super. 1992) (*per curiam*).[19]

As quoted above, Mother's brief cites multiple instances of alleged hearsay during the testimony of each of DHS's witnesses. Nevertheless, for the majority of these alleged hearsay instances — specifically, all of Mother's objections to Ms. Muhammed's and Ms. Brerton's testimony and to Mr. Brooks's cross-examination — Mother did not object based on hearsay during the dependency hearing, and the family court never discussed hearsay when ruling on the objections. N.T. at 24-27, 46-48, 60-63. As Mother failed to object on the basis of hearsay in the family court and as the specific grounds were not apparent from the record, these particular challenges are not preserved for appellate review. *Commonwealth v. Parker*, 104 A.3d 17, 29 (Pa. Super. 2014); Pa. R. Evid. 103(a)(1).

Mother did make a hearsay objection during the testimony of Ms. Johnson. *See* Mother's Brief at 17-18 (quoting N.T. 51-52). When asked for the basis for her concerns about Mother being reunified with Ai.A., Ms. Johnson referred to past reports in the file regarding physical abuse by Mother. N.T. 51-52. Mother's objection stopped further testimony on this

---

[19] We may rely on cases predating the enactment of the Pennsylvania Rules of Evidence to the extent they comport with the rules. *Commonwealth v. Aikens*, 990 A.2d 1181, 1185 n.2 (Pa. Super. 2010).

point, but her brief nevertheless cites this one answer by Ms. Johnson as improper because it referred to information in DHS records that were not actually introduced at trial. Mother fails to establish, however, how this one answer was so harmful as to justify relief. The court responded to counsel's objection by stating, "Okay. You can cross-examine the witness." *Id.* at 52. But when the time came to cross-examine Ms. Johnson, Mother's counsel chose not to do so. *See* N.T. at 58.

Mother's brief presents as prejudicial the testimony by Ms. Johnson that, when discussing her assignment to investigate the 2015 CPS Report, she "said '... I can't speak of what happened prior to me receiving this case. . . . I've had the chance to go into the system and read prior reports . . . .'" Mother's Brief at 17. But that statement, which can be read as Ms. Johnson purposefully excluding references to events that happened before she became involved in Ai.A.'s case, was made in the context of concerns about Ai.A. being reunified with **Father**, not with Mother. *See* N.T. at 51. We therefore do not see how it could have prejudiced Mother.

The remainder of Ms. Johnson's testimony consisted of matters within her personal firsthand knowledge, about which she was free to testify. Pa.R.E. 602 ("[a] witness may testify to a matter" of which "the witness has personal knowledge"). Her testimony was both competent and relevant to the issues to be determined, Family Ct. Op. at 12 & 13 n.3, and thus was admissible. *Moroney*, 850 A.2d at 632.

Mother also maintains that hearsay was improperly admitted during the direct examination of Mr. Brooks. Mother's Brief at 18 (citing and quoting excerpts from N.T. at 10-15, 17, 19). But a review of the record discloses that the family court did not rely on any of Mr. Brooks's references to the DHS record in reaching its decision. *See* Family Ct. Op. at 12-13, 15-16. The only part of Mr. Brooks's testimony which the family court referenced was a fact that came from Mr. Brooks's direct knowledge — that, "when [he] had the case" Mother was never "in compliance with mental health treatment, to [his] knowledge." N.T. at 17; *see* Family Ct. Op. at 13. As recounted above, Mother offered no evidence disputing Mr. Brooks's statements about her failure to obtain mental health treatment. *See generally* N.T. at 77-92. Therefore, even if Mr. Brooks' testimony included hearsay (an issue we need not reach[20]), the admission of that evidence was harmless.

In sum, upon review of Mother's hearsay objections, we fail to see error sufficient to justify reversal of the trial court's judgment. As noted, we defer to a trial court on evidentiary issues. We see no clear abuse of discretion here. And, apart from that deference, we conclude that any error that might have occurred was harmless when viewed in the context of the entire record. There was overwhelming and clear and convincing admissible

---

[20] The trial court held that the testimony was admissible under Rule 803(6) of the Rules of Evidence, which deals with business records.

evidence in support of dependency from the testimony of Ms. Johnson, Ms. Brerton, and Mother herself. **See** N.T. at 29-40, 54, 83; **M.T.**, 607 A.2d at 280-81. We therefore affirm the trial court's judgment.

Orders affirmed.

Judge Dubow did not participate in the consideration or decision of this case.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/14/2017