J-A18040-18

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF:<br>T.R.G. A/K/A T.G., A MINOR | : | IN THE SUPERIOR COURT OF<br>PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF M.G., FATHER | : | No. 308 EDA 2018 |

Appeal from the Decree Entered October 25, 2017
in the Court of Common Pleas of Philadelphia County
Family Court at No(s):  CP-51-AP-0000982-2017
CP-51-DP-0002025-2015
FID: 51-FN-001680-2015

BEFORE:    STABILE, J., STEVENS, P.J.E.,* and STRASSBURGER, J.**

MEMORANDUM BY STRASSBURGER, J.:        **FILED SEPTEMBER 11, 2018**

M.G. (Father) appeals *nunc pro tunc* from the decree entered October 25, 2017 granting the petition of Philadelphia Department of Human Services, Children and Youth Division (DHS) to terminate involuntarily Father's parental rights to his minor child, T.R.G., a/k/a T.G. (Child), born in December 2006. Father's notice of appeal also challenges the order changing Child's permanency goal to adoption.  We affirm.

The relevant procedural history and facts may be summarized as follows.  Child's biological parents are Father and V.H. (Mother).[1]  On July 9,

---

[1] On October 25, 2017, the family court terminated involuntarily Mother's parental rights to Child.  Mother appealed, and this Court affirmed.

* Retired Justice specially assigned to the Superior Court.

**Retired Senior Judge assigned to the Superior Court.

2015, DHS opened services for this family after receiving a general protective services (GPS) report from St. Christopher's Hospital for S.D.S., Child's maternal half-sibling.[2] The next day, DHS visited Mother's home and discovered it had a strong odor of urine, was infested with flies, did not have a working refrigerator or stove, and had a kitchen floor with structural deficiencies and a possibility of collapse. There was also a high level of lead in the home. DHS returned four days later and talked to Mother about keeping a clean and sanitary home and obtaining medical care for S.D.S. Social workers returned several times over the next week, but were refused entry each time. On July 21, 2015, a social worker returned with police and removed Child and S.D.S. (collectively, Children) due to deplorable home conditions and inadequate healthcare. Child was wearing only underwear, and after being told to get dressed, he returned wearing soiled clothing that smelled of urine. DHS requested Child's asthma inhaler, but Mother was unable to produce it. DHS obtained protective custody orders for Children that same day. During this time, Father was incarcerated. N.T., 10/25/2017, at 79.

---

[2] S.D.S. is not part of this appeal.

After an initial placement in foster care through NorthEast Treatment Center (NET), Child was placed in kinship foster care with his paternal grandmother, M.G. (Grandmother), in September 2015.[3]

Based on the foregoing, Child was adjudicated dependent in September 2015. Following Child's adjudication of dependency, the family court held several permanency review hearings. Father was released from prison sometime in 2016.[4] However, at a permanency review hearing in January 2017, the family court found Father's visitation with Child inadequate, ordered all of Father's visits suspended until Father appeared in family court, and ordered DHS to attempt to locate him. DHS later found Father living at a local rescue mission. Throughout the dependency proceedings, Father was ordered to have visits with Child at Grandmother's home.

According to DHS, Father was suspected of abusing illegal drugs, was transient, failed to secure safe and appropriate housing, failed to demonstrate financial ability to care for Child, failed to maintain consistent and meaningful visitation or contact with Child, and failed to develop any parent-child relationship with Child. Petition for Involuntary Termination of Parental Rights, 10/5/2017, at Exh. A, ¶¶ z, hh, kk.

_____

[3] S.D.S. was placed elsewhere.

[4] N.T., 10/25/2017, at 79.

On October 5, 2017, DHS filed a petition to terminate involuntarily the parental rights to Child of both Father and Mother and to change the placement goal to adoption. A hearing was held on October 25, 2017. Child was represented at the hearing by a guardian *ad litem* and legal counsel.[5] Relevant to this appeal, the family court heard testimony from Quaemia Sanders, CUA case manager, Father, and Grandmother.

At the time of the hearing, Child had been in foster care for 27 months and had been living with Grandmother for nearly all of that time. According to Sanders, Father's objectives were to comply with NET and recommended services. N.T., 10/25/2017, at 23. Following his release from prison, Father was living at a local drug and alcohol recovery program. *Id.* at 24. Sanders testified that Father did not have appropriate housing, was not gainfully

_____

[5] We note our displeasure with counsel for Child's failure to file a brief in this Court or otherwise advocate for Child's interests on appeal. Counsel's duty to represent a child does not end at the conclusion of the termination of parental rights hearing. **In re Adoption of T.M.L.M.**, 184 A.3d 585, 590 (Pa. Super. 2018); **see also In re M.T.**, 607 A.2d 271, 276 (Pa. Super. 1992) (observing that child's counsel abdicated his legal responsibilities to his client because counsel, *inter alia*, failed to file a brief, indicate that he joined another party's brief, or otherwise notify this Court of his client's position). Despite the foregoing, because this deficiency does not substantially impede our review of the issues Father has presented herein, we will address the merits. **See Jacobs v. Jacobs**, 884 A.2d 301, 305 (Pa. Super. 2005).

employed,[6] had not provided meaningful financial support for Child,[7] and had not been consistent in his visits with Child. *Id.* at 24-26, 49-50. Further, Grandmother contacted Sanders in August 2017 to request that supervised visits between Child and Father occur at a location other than her home, because Grandmother had obtained a restraining order against Father. *Id.* at 26-27. When Sanders informed Father of this visitation change, he declined to continue any visits with Child. *Id.* Instead, he said he would rather wait to see Child "once he is on his own." *Id.*

Sanders testified that she sees Child monthly at Grandmother's home, but has never observed any visits between Child and Father. *Id.* at 26-27, 47-48. Child does not ask about Father and expressed to Sanders that he wants to continue living with Grandmother. *Id.* at 27-28. Sanders testified that Child and Grandmother have a "wonderful bond" and he looks to her for all his needs. *Id.* at 48-49. She stated Child is safe and happy in Grandmother's home. *Id.* at 29. Grandmother's home is supportive and Sanders testified that there is "nothing but positive interaction" between Child and Grandmother. *Id.* at 22. Grandmother has attended to all of Child's medical and educational needs, including special education services. *Id.* at

---

[6] Father sold water on the street in Grandmother's neighborhood. N.T., 10/25/2017, at 25, 40.

[7] Grandmother testified that Father gave Child a phone a few days before the hearing and "bought food stamps" a couple times. N.T., 10/25/2017, at 57.

30-31. Since living with Grandmother, Child is no longer having tantrums at school, is no longer on medication relating to his behavior, and has the benefit of an individualized education plan for special education services at school. *Id.* at 30, 32-33. Father has not attended any of Child's school-related meetings or activities. *Id.* at 28. Sanders opined that Child would not suffer irreparable harm if parental rights were terminated, and believes termination is in Child's best interests. *Id.* at 28-29.

Additionally, Grandmother confirmed at the hearing that Child has lived with her for nearly two years, that she has been his primary caregiver, and that she seeks to adopt him. *Id.* at 52. She stated she has seen a significant improvement in Child during his time with her. *Id.* at 58. Grandmother expressed concern over Child's behavior when Father appears at her home because Child (and another grandchild) run upstairs to hide when Father appears. *Id.* at 53-54, 62-63. She also expressed concern over Father's behavior, which resembles bipolar disorder with his mood swings and fits of anger, and she believes he may be on drugs. *Id.* at 55-56, 59.

Next, Father testified against his counsel's advice. *See id.* at 76. Father confirmed he had been incarcerated for terroristic threats, assault, and arson. *Id.* at 80. He provided evidence that he had completed recently a drug and alcohol treatment program, which was a condition of his probation. *Id.* at 81-82, Father Exh. 1. Father stated he had just received a settlement for social security income and would be able to attain housing, but he acknowledged he

- 6 -

remained without housing as of the hearing date. *Id.* at 83-84. He stated he receives mental health treatment and takes daily medications relating to his mental health. *Id.* at 47, 88-89. Notably, the family court did not find Father to be credible. *Id.* at 94 (stating at the conclusion of the hearing that "… [Father] presents to [the family court] as someone who has no credibility whatsoever"); *see also* Trial Court Opinion (TCO), 3/14/2018, at 21-22.

At the conclusion of the hearing that day, the family court entered a decree terminating Father's parental rights pursuant to subsections 2511(a)(1), (2) and (b) of the Adoption Act, 23 Pa.C.S. §§ 2101-2938. On January 16, 2018,[8] Father filed a notice of appeal along with a concise statement of errors complained of on appeal pursuant to Pa.R.A.P.

---

[8] While no party has challenged the timeliness of this appeal, we may raise *sua sponte* the issue since it goes to our jurisdiction to entertain an appeal. *In re Adoption of W.R.*, 823 A.2d 1013, 1015 (Pa. Super. 2003). Father had 30 days, or until November 24, 2017, to file a notice of appeal with this Court. However, ten days before the expiration of the appeal period, Father's counsel was granted permission to withdraw and the family court did not appoint new counsel for Father until December 11, 2017. From November 14, 2017 until December 11, 2017, Father was without counsel. Father was never given notice by the court that it had granted his counsel permission to withdraw; as such, Father could not timely file *pro se* a notice of appeal or retain new counsel to file same. Thereafter, Father, through counsel, filed a petition for reinstatement of appeal *nunc pro tunc*, which the family court granted. Based on the foregoing, we find it was within the family court's discretion to grant Father *nunc pro tunc* relief because of a breakdown in the court operations of the family court. *W.R.*, 823 A.2d at 1015 (holding "a trial court may grant an appeal *nunc pro tunc* when a delay in filing an appeal is caused by … some breakdown in the court's operation through a default of its officers") (citation omitted).

1925(a)(2)(i) after the family court permitted Father to file an appeal *nunc pro tunc*.[9]  The family court filed its opinion on March 14, 2018.

Father raises the following issues on appeal:

1. Did [DHS] sustain the burden that Father's rights should be terminated where there was evidence that Father had completed and/or had been actively completing [his] permanency goals?

2. Was there sufficient evidence presented to establish that it was in the best interest of [Child] to terminate Father's parental rights?

Father's Brief at 4 (unnumbered).

We consider Father's issues mindful of our standard of review.

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record.  If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion.  A decision may be reversed for an abuse of discretion only upon demonstration of manifest

_____

[9] Father filed one notice of appeal to challenge both the October 25, 2017 termination decree and the October 25, 2017 permanency review order, and included the docket numbers for both Child's dependency and adoption matters.  The correct procedure in this circumstance is to file separate notices of appeal for each docket.  *See* Pa.R.A.P. 341, Note ("Where … one or more orders resolves issues arising on more than one docket or relating to more than one judgment, separate notices of appeal must be filed.").  Our Supreme Court has held that the failure to file separate notices of appeal from an order resolving issues on more than one docket "requires the appellate court to quash the appeal."  *Commonwealth v. Walker*, ___ A.3d ___, 2018 WL 2448643 at *6 (Pa. filed June 1, 2018).  However, this holding applies only "in future cases."  *Id.*  Thus, because Father filed his notice of appeal prior to the filing of our Supreme Court's decision in *Walker*, we do not quash his appeal.

- 8 -

unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by section 2511 of the Adoption Act, which requires a bifurcated analysis.

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in [subs]ection 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to [subs]ection 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child….

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In this case, the family court terminated Father's parental rights pursuant to subsections 2511(a)(1), (2) and (b). We need only agree with the court as to any one subsection of 2511(a) in order to affirm. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Here, we analyze the family court's decision to terminate under subsection 2511(a)(2), which provides as follows.

**(a) General Rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\*\*\*

- 9 -

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S. § 2511(a)(2).

In order to terminate parental rights pursuant to 23 Pa.C.S.[] § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted).

Father contends that he was achieving his single case plan goals and working toward reunification with Child, and that his only obstacle was lack of housing. Father's Brief at 10 (unnumbered). However, the family court concluded there is "clear and convincing evidence that Father failed and refused to perform parental duties, failed to address the conditions which brought [Child] into placement, and lacks the capacity to adequately provide

care and control and a stable environment necessary for this eleven year old Child." TCO, 3/14/2018, at 16-17. The family court further found that "Father cannot provide a permanent, healthy, safe environment for [Child], and Father's lack of action demonstrates his inability to care for [Child] now or in the future." *Id.* at 18-19.

The family court's conclusions are supported by the record, and we discern no error or abuse of discretion. The record confirms that Father has neglected to parent Child, and that Father cannot or will not remedy the conditions and causes of such neglect in the foreseeable future. There is no evidence that Father has, at any point during Child's life, had custody of him or provided support, nor is there evidence he will be able to act as Child's parent within a reasonable time. Father is transient, lacks safe and appropriate housing, is not gainfully employed, has not consistently visited with Child, rejected opportunities to visit with Child when it was not convenient to him, and does not attend Child's school or counseling meetings. We have repeatedly made clear that "a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa. Super. 2006). Accordingly, we conclude there is no merit to Father's argument that

the family court erred when it terminated involuntarily Father's parental rights under subsection 2511(a)(2).

Having concluded the statutory grounds for termination under subsection 2511(a) were met, we turn our analysis to subsection 2511(b). As our Supreme Court has explained, "[i]f the grounds for termination under subsection (a) are met, a court 'shall give primary consideration to the developmental, physical and emotional needs and welfare of the child' [as outlined in 23 Pa.C.S. § 2511(b)]." **T.S.M.**, 71 A.3d at 267. That subsection provides as follows.

> **(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(b).

We have explained the analysis under subsection 2511(b) as follows.

> [Subs]ection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, [subs]ection 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be

- 12 -

considered by the court when determining what is in the best interest of the child.

> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015) (quoting

*In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011)) (quotation marks and

citations omitted).

On appeal, Father argues that the family court should not have terminated his rights pursuant to subsection 2511(b) because there is "insufficient evidence to establish that it was in the best interests of [Child] to be adopted." Father's Brief at 12 (unnumbered). According to Father, the family court "was never presented with enough information to determine whether there was a bond between [Child and Father]." *Id.*

In assessing whether termination best meets Child's needs and welfare, the family court relied on "the credible testimony of [Sanders and Grandmother], who provided tangible and intangible dimensions of the needs and welfare of [Child]." TCO, 3/14/2018, at 19. The family court also relied on Sanders's testimony that Child would not suffer irreparable harm and her testimony that it would be in Child's best interest if both parents' rights were terminated. *Id.* at 20. Specifically, the family court noted the testimony of

- 13 -

Sanders and Grandmother that Child feels safe with Grandmother, is happy with her, never asks for Father, has lived with Grandmother for two years, and that Grandmother has attended all of Child's school meetings and counseling sessions. *Id.* After also noting Child's bond with Grandmother, the family court concluded termination best served the needs and welfare of Child. *Id.*

The record supports the family court's determination and we find no error or abuse of discretion. The unrefuted testimony shows Child is bonded to Grandmother and is thriving in her home. Further, Child articulated his preference that he wants to stay with Grandmother. He is safe and happy with her, has been in a stable family environment with her for two years, and looks to her for his safety, security, and all of his needs. Removal of Child from Grandmother's home would destroy the continuity in his life and almost certainly undo what he has been able to achieve while living with her, including marked improvement in behavior and school, receipt of special education services, and lack of a need for medication.

Moreover,

this Court has held that "the [family] court is not required by statute or precedent to order a formal bonding evaluation be performed by an expert." *In re K.K.R.–S.*, 958 A.2d 529, 533 (Pa. Super. 2008). While it may be "wise" to conduct a "bonding evaluation" where there is evidence of a bond, in other cases "direct observation of the interaction between the parent and the child is not necessary and may even be detrimental to the child." *In re K.Z.S.*, 946 A.2d 753, 762–63 (Pa. Super. 2008). Furthermore, the [family] court is free to rely upon the

assessments of social workers and caseworkers. *In re M.A.B.*, 166 A.3d 434, 444 (Pa. Super. 2017).

*In re Adoption of J.N.M.*, 177 A.3d 937, 944–45 (Pa. Super. 2018); *see also K.Z.S.*, 946 A.2d at 762-63 ("In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists.").

Sanders testified Child never asks about Father. Whatever relationship Child may have with Father is attenuated, particularly given Child's behavior of running upstairs to hide from Father when he appears at Grandmother's home. There is absolutely no evidence to suggest Child is bonded to Father, such that terminating Father's parental rights will sever an existing, necessary, and beneficial relationship or that it will result in irreparable harm to Child. Sanders opined that Child would not suffer irreparable harm if parental rights were terminated, and believes termination is in Child's best interests. As such, the bond between Child and Grandmother is the primary bond to protect. *See K.Z.S.*, 946 A.2d at 764. Thus, we find the family court correctly determined that termination of Father's parental rights best serves the needs and welfare of Child under subsection 2511(b).

Because evidence of record supports the family court's decision to terminate Father's parental rights, we have no reason to disturb it. Accordingly, we affirm the decree terminating Father's parental rights and the permanency review order changing Child's permanency goal to adoption.

Decree affirmed.

J-A18040-18

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>9/11/18</u>