J-S04019-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: J.L.P., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: C.L.P., MOTHER | : | No. 1552 MDA 2018 |

Appeal from the Decree Entered September 10, 2018
In the Court of Common Pleas of Centre County
Orphans' Court at No(s): 2018-4307

BEFORE:   SHOGAN, J., OTT, J., and STEVENS*, P.J.E.

MEMORANDUM BY OTT, J.:                    **FILED MARCH 07, 2019**

C.L.P. ("Mother") appeals from the order and decree entered September 10, 2018, which terminated involuntarily her parental rights to her son, J.L.P. ("Child"), born in January 2015.[1]  After careful review, we affirm.

We summarize the relevant factual and procedural history of this matter as follows.  Centre County Children and Youth Services ("CYS") first became involved with this family in February 2016.  **See** Petitioner's Exhibit 1 (findings of fact attached to order of adjudication and disposition).  Most recently, CYS received a report on March 1, 2017, indicating that Mother transported Child

---

* Former Justice specially assigned to the Superior Court.

[1] The orphans' court entered a separate order and decree at the same time terminating involuntarily the parental rights of R.L.D., Child's father.  R.L.D. did not appeal the termination of his parental rights, nor did he participate in this appeal.

to a medical appointment "on a motorized child's . . . four-wheeler." N.T., 8/24/18, at 65. Initially, when CYS attempted to visit Mother's home, she would not let the caseworker inside and would only "yell through the door." *Id.* at 66. Mother finally allowed CYS inside her home on March 20, 2017, at which time the caseworker observed that the home was dirty and unsafe.[2] *Id.* at 67. CYS received an additional report on May 2, 2017, indicating that Child "was found wandering around alone on the streets" with the family dog, and "when the dog had started to drag him, a concerned citizen called the police." *Id.* at 72. The police then retrieved Child and returned him to Mother. *Id.* CYS obtained emergency custody of Child the following day, but Mother was not at home. *Id.* at 73. Mother also refused to state where she and Child were when CYS called her on the phone. *Id.* The juvenile court adjudicated Child dependent on May 12, 2017, but his whereabouts remained unknown. *See* Petitioner's Exhibit 1 (order of adjudication and disposition). Mother absconded with Child for weeks before turning herself in to police pursuant to a bench warrant on May 29, 2017. N.T., 8/24/18, at 74-75.

Following Child's adjudication of dependency, Mother began receiving reunification services from Family Intervention Crisis Services ("FICS"). *Id.* at 83. FICS referred Mother to a therapist. *Id.* at 86-87. However, Mother

---

[2] CYS returned to Mother's home on April 5, 2017, after receiving a referral raising concerns regarding her mental health and ability to care for Child. *See* Petitioner's Exhibit 1 (findings of fact attached to order of adjudication and disposition). The caseworkers were able to observe Child and the condition of the home only briefly during their visit, because Mother yelled at them and demanded that they leave. *Id.*

failed to attend therapy appointments consistently. *Id.* at 89. When Mother did attend appointments, the therapist found her "difficult to engage, . . . paranoid at times and uncooperative." *Id.* During one appointment, Mother accused the therapist of "hiding FICS staff in her closet[.]" *Id.* Mother also failed to comply with FICS's recommendations that she see a psychiatrist for medication management and obtain a psychological evaluation. *Id.* at 90.

In October 2017, Mother's boyfriend, C.B., met with FICS and raised his own concerns regarding her mental health. *Id.* at 91. He stated that Mother "was talking to herself, that she was staring at him and that he feared for his life, and that he was afraid he'd wake up and she'd stab him." *Id.* FICS met with Mother, who agreed to receive inpatient mental health treatment. *Id.* FICS was present for Mother's mental health assessment, during which she reported "that she had attempted to commit suicide the evening prior by taking too many sleeping pills. She also stated that she feels like she thinks about killing herself all the time, that she also self-harmed by cutting her arms about two weeks prior to this incident." *Id.* at 92. Mother began inpatient treatment on October 26, 2017, and remained there until November 12, 2017. *Id.* at 94. On one occasion during treatment, Mother attempted to leave the facility, prompting the staff to obtain an involuntary commitment. *Id.*

After her release from inpatient treatment, Mother failed to attend any of her therapy appointments and her mental health began to deteriorate once again. *Id.* at 95. During a visit with Child on November 21, 2017, Mother "appeared to be disoriented. She could not stand up on her own, she needed

assistance. She kept getting up from the couch and walking to another couch." *Id.* at 96. FICS staff attempted to help Mother down the stairs "because she wanted to go outside and she went down three steps and then turned around and said she didn't want to go outside. She had a really difficult time remaining still and was very shaky." *Id.* Mother participated in another mental health assessment, during which she admitted using heroin "about a month previous to that[.]" *Id.* at 98. However, Mother did not consent to additional inpatient treatment, nor did she meet the criteria for treatment at that time. *Id.* Later that day, C.B. called FICS stating that he was leaving Mother, and reporting that she had exhibited additional unusual behaviors during the afternoon. *Id.* at 99. FICS then received three phone calls from Mother within fifteen minutes. *Id.* at 100. The record reveals the content of these phone calls as follows.

> . . . . The first one she had asked staff why everybody was being weird and what was going on. When staff asked her to clarify, she said she didn't know and would call staff back the next day.
>
> A few minutes later after staff hung up the phone, she had called staff. And as soon as staff picked up the phone, she had asked staff if she was going to die. Staff asked her if she was thinking of harming herself and [Mother] said no, everybody is being weird and am I going to die. Staff again asked [Mother] if she was going to harm herself and she had said she was not. She said that she was going to go over [to] her dad's house for the evening and got off the phone with staff.
>
> Probably about five minutes later, she called staff again and was at her father's residence and stated that everyone there was trying to have sex with her, specifically she had stated that her father was trying to have sex with her. . . .

- 4 -

*Id.* at 100-01.[3] Mother returned to her home and met with FICS staff and C.B., who convinced her to receive further inpatient treatment. *Id.* at 101-02. Mother then changed her mind almost immediately and refused to go. *Id.* at 102.

In December 2017 and January 2018, Mother produced several positive drug screens for benzodiazepines, alcohol, and unprescribed suboxone. *Id.* at 109. Mother attended only "a few" visits with Child during this time, and failed to attend any of her meetings with FICS. *Id.* at 103. During the visits C.B. attended with Mother, he was the main caretaker of the Child. *Id.* "There [were] a lot of times that [Mother] . . . it was as if [Child] wasn't even in the room during her visits with him." *Id.* C.B. "tried to encourage [Mother] a lot to engage with [Child] and she wasn't responsive." *Id.* at 104.

For a brief period from late January 2018 until February 2018, Mother began to show improvement. *Id.* at 107-10. Mother initiated mental health and drug and alcohol treatment, and did not produce a positive drug screen. *Id.* at 108-10. However, Mother's progress deteriorated in March 2018. *Id.* at 113. Mother stopped attending therapy, drug and alcohol treatment, and her meetings with FICS. *Id.* at 113, 121. CYS filed a petition to terminate Mother's parental rights to Child involuntarily on March 22, 2018 and by

---

[3] Mother had alleged to FICS previously that her father sexually abused her "when she was younger[.]" N.T., 8/24/18, at 87, 101.

order entered April 17, 2018, the orphans' court appointed legal counsel to represent Mother during the termination proceedings.

Mother tested positive for oxycodone on March 27, 2018, and her drug and alcohol treatment program discharged her for noncompliance on April 6, 2018. *Id.* at 113-14. Mother last attended a visit with Child on April 19, 2018. *Id.* at 122.

In May 2018, FICS learned that Mother had once again been committed involuntarily. *Id.* at 117. The record reveals that the commitment resulted from the following events.

> . . . . [Mother] had contacted her landlord to come and unclog her toilet. When they had came [*sic*] to the residence, they believed that she clogged the toilet herself. And then she was perched on the window like a bird and chirping like a bird, that she had -- that she had broken into the heat room and jacked the heat up real high and she had clothes on that would have made her very hot. . . .

*Id.*[4]

Mother was released on May 14, 2018. *Id.* About a week later, Mother "wrecked her car into a tree and fled the scene. And then again on June 8th, she was arrested."[5] *Id.* at 118. Meanwhile, on June 4, 2018, CYS filed a

---

[4] Mother was evicted from her residence in May 2018 due to her failure to pay rent. N.T., 8/24/18, at 128. At the time of the termination hearing, FICS believed that she was living with her brother. *Id.*

[5] It appears the charges were withdrawn. *See* N.T., 8/24/18, at 118-19.

petition requesting that the orphans' court appoint a guardian *ad litem* ("GAL") for Mother, averring that she "might be suffering from incompetency issues." Petition for Appointment of Guardian Ad Litem, 6/4/18, at 1. The court conducted a hearing to address CYS's petition on July 3, 2018, after which it entered an order appointing a GAL and directing that Mother obtain a mental health evaluation to determine her competency.[6]

On July 27, 2018, C.B. reported to FICS that Mother "had been missing for approximately a week prior. He did contact staff the following Monday and stated she had returned and was brought back to Centre County from Pittsburgh by a police car. . . . He also indicated that she had shaved her head." N.T., 8/24/18, at 119. Finally, FICS received a report on August 10, 2018, indicating that Mother was at her father's residence, that her father had concerns about her mental health, and that she had used unprescribed valium. *Id.*

The orphans' court conducted a termination hearing on August 24, 2018, at which Mother failed to appear. However, her legal counsel was present. At the start of the hearing, the court and the parties' counsel discussed at length the issue of Mother's alleged incapacity. Mother's counsel began by making

---

[6] The orphans' court indicates in its opinion that Mother did not obtain the evaluation. Orphans' Court Opinion, 10/5/18, at 2.

an oral motion to postpone the hearing.[7]  He expressed concern that CYS would not be presenting the testimony of anyone "from the mental health profession as to my client's alleged . . . mental health incapacity" and argued that the court could not proceed without first hearing evidence and ruling on that issue.   N.T., 8/24/18, at 3-8.  CYS opposed the motion on the basis that Mother was not cooperating, and that a postponement would deny Child permanency.[8]  *Id.* at 8-11.  Child's counsel agreed with CYS, asserting that Mother had received sufficient due process protections.[9]   *Id.* at 20-23.  Ultimately, the court concluded that Mother "has been afforded due process in this case" and proceeded with the hearing.  *Id.* at 23.  At the conclusion of the hearing, the court announced that it would terminate Mother's parental

_____

[7] Mother's counsel requested previously that the orphans' court postpone the hearing in a memorandum of law filed August 21, 2018.

[8] The orphans' court heard brief testimony from Mother's GAL, who explained that she had been unable to get in contact with Mother.  N.T., 8/24/18, at 17-18.

[9] Child's counsel also served as his GAL during the dependency proceedings. At the beginning of the termination hearing, he stated, "Your Honor, for the record, I have been the [GAL] for [Child] in the dependency matter.  This being the termination of parental rights, given the age of [Child] and given the circumstances of this case, I did not consider any type of conflict for me to proceed as legal counsel in this matter, Judge."  N.T., 8/24/18, at 3.  Child was three and a half years old at the time of the hearing.  *See In re T.S.*, 192 A.3d 1080, 1092-93 (Pa. 2018) (holding that a very young and pre-verbal child's right to counsel is satisfied when the orphans' court appoints an attorney as the child's GAL and the attorney represents the child's best interests).

rights. The court entered a termination order and decree on August 30, 2018, followed by an amended order and decree on September 10, 2018.[10] Mother timely filed a notice of appeal on September 19, 2018, along with a concise statement of errors complained of on appeal.

Mother now raises the following issues for our review.

I. Did the [orphans' c]ourt err in appointing a [GAL] for Mother without an adjudication of incompetency/incapacity in that the [orphans' c]ourt failed to conduct an evidentiary hearing with expert testimony of mental health professionals and review of Mother's mental health records and diagnoses where the issue of Mother's alleged incompetency/ incapacity [*sic*] had been alleged by CYS?

II. Did the [orphans' c]ourt err in proceeding with the involuntary termination hearing without first conducting an evidentiary hearing with expert testimony of mental health professionals and review of Mother's mental health records and diagnoses to determine whether Mother should be adjudicated incompetent/incapacitated where the issue of Mother's alleged incompetency/incapacity had been alleged by CYS?

III. Did the [orphans' c]ourt err in terminating Mother's parental rights where the issue of Mother's alleged incompetency/incapacity had been alleged by CYS and, at time of hearing, CYS presented no expert testimony of mental health professionals nor provided to the [orphans' c]ourt for its review Mother's mental health records and diagnoses?

Mother's brief at 4.

We consider these claims mindful of our well-settled standard of review.

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported

---

[10] The orphans' court dated its original order and decree August 21, 2018, which was three days prior to the termination hearing. The court corrected the date to August 24, 2018, in its amended order and decree.

by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

In her first issue on appeal, Mother argues that the orphans' court erred by appointing a GAL without finding that she is incapacitated and by failing to conduct a hearing on her alleged incapacity including the testimony of expert witnesses. Mother's brief at 9-11. She contends "that the appointment of the [GAL] should not have been made and/or once made, should have been vacated until such time, if ever, that the [orphans' c]ourt determined, . . . Mother is an incapacitated person . . . ." *Id.* at 11.

The Adoption Act provides that a parent in an involuntary termination proceeding has the right to legal counsel. *See* 23 Pa.C.S.A. § 2313(a.1) ("The court shall appoint counsel for a parent whose rights are subject to termination in an involuntary termination proceeding if, upon petition of the parent, the court determines that the parent is unable to pay for counsel or if payment would result in substantial financial hardship."). Moreover, our Orphans' Court Rules provide that the court shall appoint a GAL for a parent if he or she is under eighteen years of age and is not "already adequately represented[.]" Pa.O.C.R. 15.4(c)(1). While the language of Rule 15.4(c)(1) applies solely to

parents who are minors, this Court has also found the rule instructive in cases where parents suffer from alleged mental incapacity. We have clarified that mentally incapacitated parents are not entitled to a GAL when they already possess legal counsel providing adequate representation of their interests. *See In re S.C.B.*, 990 A.2d 762, 769 (Pa. Super. 2010) ("[A]lthough the Orphans' Court Rule . . . is specifically applicable only to individuals under the age of 18 years, we conclude that the reasoning behind the rule's provision is equally persuasive when an allegedly mentally incapacitated parent has adequate representation by her own counsel.").

In the case at bar, the orphans' court appointed legal counsel for Mother on April 17, 2018. In addition, the record indicates that Mother was born in October 1992, and just under twenty-six years old at the time of the hearing. Because Mother had counsel to represent her interests, and because she was an adult, we agree that the court erred by appointing a GAL. Nonetheless, it is clear that the court's error was harmless. *See In re M.T.*, 607 A.2d 271, 281 (Pa. Super. 1992) (citing *Semieraro v. Commonwealth Utility Equipment Corp.*, 544 A.2d 46, 47 (Pa. 1988)) (observing that an error must actually harm an appellant to justify awarding a new trial). As the court acknowledged in its opinion, the GAL was unable to contact Mother and never met with her. Orphans' Court Opinion, 10/5/18, at 2; N.T., 8/24/18, at 17-18. Thus, we conclude that Mother's first issue merits no relief.

In her second issue, Mother argues that the orphans' court should have postponed the termination hearing until expert testimony could be provided

on Mother's alleged incompetency or incapacity. Mother's brief at 12. We disagree. If counsel believed his client had diminished capacity, it was his obligation under the Rules of Professional Conduct to seek her medical records from her involuntary commitments, request an examination by medical professionals, or petition for a guardian as specifically addressed in Pa.R.P.C. 1.14.

> **Rule 1.14. Client with Diminished Capacity.**
>
> (a) When a client's capacity to make adequately considered decisions in connection with a representation is diminished, whether because of minority, mental impairment or for some other reason, the lawyer shall, as far as reasonably possible, maintain a normal client-lawyer relationship with the client.
>
> (b) When the lawyer reasonably believes that the client has diminished capacity, is at risk of substantial physical, financial or other harm unless action is taken and cannot adequately act in the client's own interest, the lawyer may take reasonably necessary protective action, including consulting with individuals or entities that have the ability to take action to protect the client and, in appropriate cases, seeking the appointment of a guardian ad litem, conservator or guardian.
>
> (c) Information relating to the representation of a client with diminished capacity is protected by Rule 1.6. When taking protective action pursuant to paragraph (b), the lawyer is impliedly authorized under Rule 1.6(a) to reveal information about the client, but only to the extent reasonably necessary to protect the client's interests.

Pa.R.P.C. 1.14.

Counsel represented Mother for over four months prior to the termination hearing and never took any affirmative action[11] to have a guardian appointed for Mother, nor did he act to protect her interests in any other way, so we must presume he did not believe his client had diminished capacity and he cannot now complain that the orphans' court erred by conducting the termination hearing. Therefore, no relief is due.

In her third issue, Mother argues that, even if the orphans' court had appointed her GAL according to the proper procedure, it would still be error for the court to terminate her parental rights without hearing expert testimony "as to the substantive issue of Mother's mental health and how it allegedly impacts her ability to parent." Mother's brief at 13. Once again, we disagree for the reasons stated *supra*.

Additionally, the record reveals that Mother waived this claim by failing to support it in her brief with citation to relevant authority. *See In re M.Z.T.M.W.*, 163 A.3d 462, 465 (Pa. Super. 2017) ("It is well-settled that this Court will not review a claim unless it is developed in the argument section of an appellant's brief, and supported by citations to relevant authority."). However, even if Mother had not waived this claim, it would be meritless.

---

[11] Mother's counsel filed a memorandum of law in response to the Orphans' Court Order of August 1, 2018. He only criticized the procedure of appointing a GAL without medical testimony and argued the proper procedure would be to proceed under the Guardianship Act.

Section 2511 of the Adoption Act governs involuntary termination of parental rights. *See* 23 Pa.C.S.A. § 2511. It requires a bifurcated analysis.

> . . . . Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In this case, the orphans' court terminated Mother's parental rights to Child involuntarily pursuant to Section 2511(a)(2), (5), and (b). We need only agree with the court as to any one subsection of Section 2511(a), as well as Section 2511(b), to affirm. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*), *appeal denied*, 863 A.2d 1141 (Pa. 2004). Accordingly, we analyze the court's termination decision pursuant to Section 2511(a)(2) and (b), which provides as follows.

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> ***
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-

- 14 -

being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\*\*\*

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

\*\*\*

23 Pa.C.S. § 2511(a)(2), (b).

We first consider whether the orphans' court abused its discretion by terminating Mother's parental rights pursuant to Section 2511(a)(2).

. . . . In order to terminate parental rights pursuant to 23 Pa.C.S.[] § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental

- 15 -

duties." **In re A.L.D.**, 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted).

Here, as recited above, the record contains overwhelming evidence that Mother is incapable of parenting Child, and that she cannot or will not remedy her parental incapacity. Mother failed to comply with reunification services, abused illegal substances, attended her visits with Child inconsistently, and engaged in inappropriate and dangerous behaviors. During the termination hearing, FICS was not certain which aspects of Mother's behaviors resulted from her substance abuse and which aspects of those behaviors resulted from any mental health issues.[12] N.T., 8/24/18, at 136. Regardless, it is clear that Mother has been unavailable to parent Child and will remain unavailable for the foreseeable future. Preserving Mother's parental rights in this case would serve only to deny Child the permanence and stability to which he is entitled. As this Court has stated, "a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." **In re Adoption of R.J.S.**, 901 A.2d 502, 513 (Pa. Super. 2006).

---

[12] Mother's involuntary commitment was accepted as a fact by all parties, but no records of diagnosis or treatment received were ever entered into the record by any party. As previously noted, Mother did not comply with the August 1, 2018 Order to obtain a mental health evaluation and the judge determined it would be improper to force her to obtain an evaluation. Orphans' Court Opinion, 10/5/18, at 2.

We next consider whether the orphans' court abused its discretion by terminating Mother's parental rights pursuant to Section 2511(b).

> . . . . Section 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, Section 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.
>
>> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015) (quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011) (quotation marks and citations omitted).

We again discern no abuse of discretion. The record reveals that Child has no bond with Mother. As discussed above, Mother did little to interact with Child during visits and C.B. acted as his primary caregiver. N.T., 8/24/18, at 103-04. Mother's reunification counselor at FICS, Jessica DuFour, testified that Child displayed more of a bond with C.B. than with Mother. *Id.* at 135.

In September 2017, FICS shortened the length of Mother's visits from two hours to one hour, "because she was having a difficult time even making it through two-hour visits. She would ask for the visit to be ended, and it just wasn't successful for her or [Child] because she wasn't participating in it." *Id.* at 130. Mother then attended her visits with Child inconsistently during December 2017, March 2018, and April 2018. *Id.* In contrast, Ms. DuFour testified that Child is "doing really great" in his foster home and is bonded with his preadoptive foster parents. *Id.* at 132. Thus, it is clear that terminating Mother's parental rights will best serve Child's needs and welfare.

Based on the foregoing, we conclude that the orphans' court did not abuse its discretion by terminating involuntarily Mother's parental rights to Child. Therefore, we affirm the court's September 10, 2018 order and decree.

Order and decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 03/07/2019